BEFORE THE
UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re Zantac/Ranitidine NDMA Litigation | MDL–_____ |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF NEW JERSEY PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 3

    A.    Plaintiffs ................................................................................................ 3

    B.    Defendants .............................................................................................. 4

    C.    Overview of Claims ................................................................................ 5

    D.    Status of the Actions .............................................................................. 8

III.    ARGUMENT ...................................................................................................... 8

    A.    The Actions involve common questions of fact, and centralization of the Actions will minimize the risk of inconsistent rulings. ........................................................ 10

    B.    Transfer will serve the convenience of the parties and prevent duplicative discovery. ............................................................................................ 11

    C.    Transfer will promote the just and efficient conduct of these Actions.................... 13

    D.    The proper transferee forum is the United States District Court for the District of New Jersey. .......................................................................................... 14

        1.    The District of New Jersey is the most appropriate transferee forum because the majority of the Actions name as Defendants companies that are based in the District of New Jersey. ................................................................. 15

        2.    The District of New Jersey is the most appropriate transferee forum because it is the most geographically convenient location for the parties. ............... 15

        3.    The District of New Jersey is the most appropriate transferee forum because it has the necessary expertise and judicial resources to handle this litigation................................................................................................. 17

IV.    CONCLUSION ................................................................................................... 19

TABLE OF AUTHORITIES

# I.     INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 6.2(a) of the Rules of Procedure of the Judicial

Panel on Multidistrict Litigation ("the Panel"), the following Plaintiffs in the following actions

respectfully submit this brief in support of their motion to transfer to the United States District

Court for the District of New Jersey all active cases identified in the Schedule of Actions ("the

Actions"), as well as any subsequently filed cases involving similar facts or claims ("tag-along

actions") for coordination of pretrial proceedings:

- Christina Garza, Pankaj Khetarpal, Corina Lingerfelt, and Justin Rowe, named Plaintiffs in *Garza, et al. v. Sanofi-Aventis U.S. LLC, et al.*, No. 5:19-cv-05772 (N.D. Cal. filed Sept. 13, 2019);

- Michael Burke, Stephanie Frasier, and Richard Harris, named Plaintiffs in both *Dimesky, et al. v. Sanofi-Aventis U.S. LLC, et al.*, No. 3:19-cv-1517 (D. Conn. filed Sept. 26, 2019) and *Santorella, et al. v. Sanofi-Aventis U.S. LLC et al.*, No. 39-cv-18146 (D.N.J. filed Sept. 20, 2019);

- Jonathan Dimesky and Mohammed Haridi, named Plaintiffs in *Dimesky, et al. v. Sanofi-Aventis U.S. LLC, et al.*, No. 3:19-cv-1517 (D. Conn. filed Sept. 26, 2019);

- Mary Santorella, Kassie Benson, and Lisa Prisinzano, named Plaintiffs in *Santorella, et al. v. Sanofi-Aventis U.S. LLC, et al.*, No. 3:19-cv-18146 (D.N.J. filed Sept. 20, 2019);

- George Cravens, Donald Boland, Venus Sykes (individually and in her capacity as representative of the Estate of Chris Sykes), Jarquisha Harris, Ronald Maranto, Scott Moser, Kileen Gromelski, Michael DeLuccia, and Paul Burpulis, Plaintiffs in both *Cravens, et al. v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.*, No. 3:19-cv-1683 (D. Conn. filed Oct. 25, 2019) and *Cravens, et al. v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.*, No. 3:19-cv-19368 (D.N.J. filed Oct. 25, 2019); and

- Fernando Zaragoza, individually and in his capacity as representative of the Estate of Leticia Zaragoza, Plaintiff in *Cravens, et al. v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.*, No. 3:19-cv-1683 (D. Conn. filed Oct. 25, 2019).

This litigation is in many ways analogous to *In re Valsartan N-Nitrosodimethylamine (NDMA)*

*Contamination Products Liability Litigation*,[1] in which this Panel transferred to the District of New

---

[1] 363 F. Supp. 3d 1378 (J.P.M.L. 2019)

Jersey for consolidated pretrial proceedings ten pending actions that "involve[d] common factual questions arising out of allegations that plaintiffs purchased or used generic formulations of valsartan medications containing the nitrosamine impurities NDMA and/or NDEA."[2]

As in the *Valsartan* litigation, the Actions at issue here arise out of allegations that Plaintiffs purchased a drug—Zantac, the brand-name version of the generic drug ranitidine—that exposed them to the carcinogen N-Nitrosodimethylamine ("NDMA"). But the litigation here is even more in need of consolidation. This litigation will almost certainly dwarf the *Valsartan* litigation because of the ubiquity of Zantac and because the NDMA in Zantac is not an impurity that only recently made its way into the drug through shoddy manufacturing but is instead *inherent to the drug's molecular structure.* Thus, over the more than 30 years that Zantac has been sold in the United States, every one of the millions of the drug's consumers has been exposed to dangerous levels of NDMA and many thousands of those consumers have contracted cancer as a result.

Plaintiffs in *Garza*, *Dimesky*, and *Santorella* have sued manufacturers of over-the-counter Zantac on behalf of classes of persons who purchased the drug seeking, among other things, a full refund for Zantac purchases made by class members. Each Plaintiffs in the two *Cravens* actions (one filed in the District of New Jersey, the other in the District of Connecticut) alleges that they contracted cancer as a result of years of Zantac use. These Plaintiffs bring individual product-liability claims against manufacturers of Zantac seeking, among other things, damages for incurred medical expenses, physical and mental pain and suffering, and other injuries resulting from the cancer caused by their use of Zantac.

---

[2] *Id.* at 1380.

In all of the Actions, Plaintiffs allege that Defendants—the manufacturers of Zantac—knew or should have known that Zantac exposed users to unsafe levels of the carcinogen NDMA and yet did nothing to warn consumers of this. In addition to their five cases, Plaintiffs are aware of ten other cases that have been filed, making for a total of fifteen Actions pending: six consumer class action and nine personal-injury actions. Plaintiffs expect additional cases to be filed in federal courts across the nation.

Based on the numerous common questions of fact involved and the compelling need to establish uniform and consistent standards in conducting pretrial discovery and motion practice, the Actions currently pending in nine different federal district courts meet the requirements for transfer under 28 U.S.C. § 1407. Accordingly, Plaintiffs respectfully request that the Actions be transferred to the District of New Jersey, the most logical and convenient location for the coordination of these proceedings.

## II.    BACKGROUND

### A.  Plaintiffs

All Plaintiffs in this litigation have filed civil actions arising from their purchase and use of Zantac. Of the fifteen Actions, six are consumer class actions and nine are personal-injury actions. Regardless of this distinction, all Actions present a common core of facts in that each Action alleges (1) that Plaintiffs purchased and used Zantac, (2) that Zantac metabolizes in the body to create the carcinogen NDMA, (3) that the quantities of NDMA that Plaintiffs were exposed to present a risk of cancer, (4) that Defendants knew or should have known that Zantac exposed consumers to NDMA, and (5) that Defendants concealed from consumers the NDMA-associated dangers posed by Zantac.

Plaintiffs in the Actions are scattered across the country, residing in California, Colorado, Connecticut, Florida, Illinois, Maryland, Massachusetts, New Jersey, New York, Oklahoma, Texas, and Wisconsin.

**B.  Defendants**

The following table contains information about the eleven Defendants in the fifteen pending Actions:

| Defendant | Number of Zantac-Related Actions Pending Against Defendant | State or Country of Principal Place of Business | State or Country of Incorporation |
|---|---|---|---|
| Boehringer Ingelheim Pharmaceuticals, Inc. | 12 | Connecticut | Delaware |
| Chattem, Inc. | 12 | Tennessee | Tennessee |
| CVS Health Co. | 1 | Rhode Island | Rhode Island |
| Dollar Tree Stores, Inc. | 1 | Virginia | Virginia |
| GlaxoSmithKline LLC | 7 | Pennsylvania | Delaware |
| GlaxoSmithKline plc | 2 | England | England |
| Pfizer, Inc. | 6 | New York | Delaware |
| Publix Supermarkets, Inc. | 1 | Florida | Florida |
| Sanofi S.A. | 4 | France | France |
| Sanofi US Services Inc. | 15 | New Jersey | Delaware |
| Sanofi-Aventis U.S. LLC | 10 | New Jersey | Delaware |

As reflected above, eight of the eleven Defendants are parties in multiple Actions. Additionally, four Defendants are parties in a majority of the actions, and two of those Defendants are based in the District of New Jersey, where Plaintiffs seek to transfer the Actions.

**C.  Overview of Claims**

Zantac belongs to a class of medications called H2-blockers, which decrease the amount of acid produced by the stomach. For over 30 years Zantac has been one of the most popular medications for treating gastrointestinal conditions such as acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.

In September 2019, Plaintiffs and the rest of the public learned that, when ingested, Zantac—and indeed *all* ranitidine products—metabolizes to produce dangerously high quantities of the carcinogen NDMA in the human body. This grave risk to consumers' health became public when Valisure, an online pharmacy, filed a citizen petition with the FDA informing the agency that its scientific testing of Zantac and generic ranitidine had revealed that each tablet of the drug contained NDMA at levels ***thousands*** of times higher than the FDA's own "permissible daily intake limit."[3] Since then, most countries have pulled Zantac and generic ranitidine from the market. In the United States, many pharmacies have pulled Zantac and ranitidine from their shelves, and manufacturers of the drug (including Defendants GlaxoSmithKline and Sanofi) have recalled their products.

The dangers that NDMA poses to human health have long been recognized. NDMA is a member the class of chemicals known as N-nitrosamines, a class of potent carcinogens. It forms in both industrial and natural processes. As early as 1979, it was well known that NDMA caused cancer in nearly every laboratory animal tested. NDMA is no longer produced or commercially used in the United States, except for research. In other words, NDMA is nothing but a poison.

---

[3] *See* Valisure Citizen Petition to FDA, *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf (last visited Oct. 31, 2019).

Defendant GlaxoSmithKline plc ("Glaxo"), an English corporation, is the successor-in-interest to the companies that initially developed, patented, and commercialized the molecule known as ranitidine, which is commonly referred to by the brand name Zantac. There is evidence that Glaxo knew or should have known about the dangers of NDMA formation posed by Zantac before placing the drug on the market in the 1980s. Among other things, the scientific literature at the time strongly suggests that drugs like ranitidine, which contain a dimethylamine (DMA) group, are highly likely to form NDMA. Indeed, Glaxo employees even responded to an article in *The Lancet* regarding the possibility of ranitidine forming N-nitrosamines.

Zantac was approved for prescription use by the FDA in 1983 and in 1986 became the first drug to reach $1 billion in total sales. Zantac became available without a prescription in 1996, and generic versions of ranitidine became available the following year. Despite the sales of generic ranitidine and alternative products, Zantac sales have remained strong; in 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac totaling $128.9 million— a 3.1% increase from the previous year.[4]

The rights to Zantac in the U.S. have changed hands several times. In 1996, over-the-counter Zantac was sold by a joint venture between Glaxo and Warner-Lambert. That joint venture ended in 1998, with Warner-Lambert (which was acquired by Defendant Pfizer) retaining the right to market Zantac. Defendant Boehringer acquired the U.S. rights to over-the-counter Zantac in late 2006 and manufactured and sold the drug in the United States from approximately January 2007 to January 2017. The Sanofi Defendants acquired the U.S. rights to over-the-counter

---

[4] *Sales growth of leading brands of antacid tablets in the United States in 2018 (change to prior sales year)*, STATISTA (last visited Nov. 1, 2019), https://www.statista.com/statistics/194547/us-salesgrowth-of-antacid-tablet-brands-in-2013/.

Zantac in approximately January 2017 and have since that time been manufacturing and selling the over-the-counter version of the drug in the United States.

Over the past 20 years, scientific studies have continued to raise concerns about NDMA forming from ranitidine. One of the most recent, and most significant, studies was published in the scientific journal *Carcinogenesis* in 2016.[5] That study found that, during the 24 hours after participants in the study ingested ranitidine, the quantity of NDMA in the participants' urine increased 400 times, "from 110 to 47 600 ng."[6] The study's authors cautioned that these "estimates are conservative."[7] The actual exposure to NDMA is "likely much higher than that eliminated in urine" since NDMA has "a high metabolic conversion rate" so that only about 0.05% of NDMA in the body is excreted in urine.[8]

Defendants knew or should have known about this 2016 study and the many earlier scientific studies showing that ranitidine formed NDMA. Defendants also should have informed the FDA and consumers of the risks of NDMA exposure posed by Zantac. Defendants did not do so.

All of the pending Actions are brought by or on behalf of persons who purchased and used Zantac. The six class actions are brought under various states' consumer-protection laws on behalf of consumers who are seeking refunds and other relief for their purchases of Zantac. The nine personal-injury actions are brought under various state laws by Plaintiffs alleging that they contracted cancer as a result of years of Zantac use. These Plaintiffs seek, among other things,

---

[5] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[6] *Id.* at 625.

[7] *Id.* at 632.

[8] *Id.*

damages for incurred medical expenses, physical and mental pain and suffering, and other injuries resulting from the cancer caused by their use of Zantac. Both the class actions and the personal-injury cases are brought primarily against the manufacturers of Zantac, but some of the Actions have also been brought against stores that sold the drug.

**D.  Status of the Actions**

The fifteen Actions that Plaintiffs seek to transfer and consolidate are pending in the Eastern District of California, the Northern District of California, the District of Colorado, the District of Connecticut, the Southern District of Florida, the Southern District of Illinois, the District of New Jersey, the Eastern District of New York, and the Southern District of New York. All of these actions were filed between September 13 and November 1, 2019. Given the infancy of these Actions, no discovery has been taken, and no other progress has occurred in the Actions such that transfer would be unduly prejudicial or inefficient for any of the parties or the judiciary. That all Actions are at early stages of litigation provides a further basis for transfer and coordination of pretrial proceedings.

## III.    ARGUMENT

The Panel may transfer to a single district court two or more civil actions pending in different districts for coordinated or consolidated pretrial proceedings when (1) the "actions involv[e] one or more common questions of fact," (2) transfer "will be for the convenience of parties and witnesses," and (3) transfer "will promote the just and efficient conduct of such actions."[9] The statute permitting multidistrict litigation, 28 U.S.C. § 1407, "was enacted as a means of conserving judicial resources in situations where multiple cases involving common questions of fact were filed

---

[9] 28 U.S.C. § 1407(a).

in different districts."[10] Section 1407 "was meant to assure uniform and expeditious treatment in the pretrial procedures in multidistrict litigation," because "conflicting pretrial discovery demands for documents and witnesses might disrupt the functions of the Federal courts."[11] The alternative to appropriate transfer is "multiplied delay, confusion, conflict, inordinate expense and inefficiency."[12]

The Actions here assert overlapping claims based on multiple common factual allegations, and will involve common legal theories and themes. Consolidated pretrial treatment under § 1407 will assist the parties and the courts in avoiding duplicative and conflicting rulings on the common issues in dispute. Granting this motion also will serve the convenience of the parties and witnesses and promote the just and efficient resolution of the litigation. This Panel has frequently ordered the transfer and consolidation of actions where, as here, the litigation involved multiple consumer class actions or personal-injury actions arising from the sale of unsafe medications.[13]

---

[10] *Royster v. Food Lion (In re Food Lion)*, 73 F.3d 528, 531–32 (4th Cir. 1996).

[11] *In re Phenylpropanolamine Prod. Liab. Litig.*, 460 F.3d 1217, 1230 (9th Cir. 2006) (quoting H.R. Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898) (internal quotation marks omitted).

[12] *Id.* (quoting *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 495 (J.P.M.L. 1968)) (internal quotation marks omitted).

[13] *See, e.g., In re Valsartan*, 363 F. Supp. 3d 1378; *In re Farxiga (Dapagliflozin) Prod. Liab. Litig.*, 273 F. Supp. 3d 1380, 1381 (J.P.M.L. 2017); *In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1353 (J.P.M.L. 2017); *In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1381 (J.P.M.L. 2015); *In re Benicar (Olmesartan) Prods. Liab. Litig.*, 96 F. Supp. 3d 1381 (J.P.M.L. 2015); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 997 F. Supp. 2d 1354, 1355 (J.P.M.L. 2014); *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 939 F. Supp. 2d 1376, 1381 (J.P.M.L. 2013).

**A. The Actions involve common questions of fact, and centralization of the Actions will minimize the risk of inconsistent rulings.**

The threshold requirement for transfer and centralization is the presence of common questions of fact.[14] Although common questions must predominate, the statute does not require a "complete identity or even [a] majority" of common questions of fact to justify transfer.[15]

Here, all Actions involve common factual questions arising out of allegations (1) that Plaintiffs purchased and used Zantac, which metabolized in their bodies to create unsafe quantities of the carcinogen NDMA, (2) that the quantities of NDMA that Zantac users were exposed to present a risk of cancer, (3) that Defendants knew, or should have known, that Zantac exposed users to NDMA, and (4) that Defendants failed to disclose the NDMA-associated dangers posed by Zantac to consumers. The common questions of fact include:

- whether the Zantac sold by Defendants metabolizes to form NDMA,
- the mechanism by which Zantac produces NDMA in the human body,
- the quantity of NDMA that a consumer of Zantac is exposed to,
- when Defendants knew or should have known that Zantac reacts to form NDMA, and
- whether the amounts of NDMA generated by Zantac present a risk of cancer or other injuries.

All of the pending and tag-along actions will raise these issues, regardless of whether the alleged manufacturer was Sanofi, Boehringer, Pfizer, Glaxo, or some other entity—and regardless of whether the case is a consumer class action or a personal-injury action.[16]

---

[14] *See* 28 U.S.C. § 1407.

[15] *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004).

[16] *See In re Valsartan*, 363 F. Supp. 3d at 1381–82 (concluding that consolidating consumer class actions with personal-injury actions was appropriate because "there [was] significant overlap in defendants in the consumer class actions and personal injury actions" such that discovery undoubtedly will overlap among these actions," and stating that "[t]he Panel often has recognized

– 10 –

Moreover, as in the *Valsartan* litigation, "[c]entralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification and *Daubert* motions; and conserve the resources of the parties, their counsel, and the judiciary."[17]

Because numerous common issues of fact exist in this litigation, the Actions satisfy the first element of the transfer analysis under § 1407.

## B.  Transfer will serve the convenience of the parties and prevent duplicative discovery.

The convenience of the parties and prevention of duplicative discovery also favor transfer.[18] Currently, all fifteen Actions are in their infancy, having been filed between September 13 and November 1, 2019. If the Actions continue to proceed separately, there will be substantial duplicative discovery because of the many overlapping issues of fact and law. Multiple actions could involve repetitive depositions of the current and former employees of Defendants GlaxoSmithKline LLC, GlaxoSmithKline plc, Boehringer Ingelheim, Chattem, Pfizer, Sanofi S.A., Sanofi US Services, and Sanofi-Aventis, as well as depositions of the same expert witnesses, productions of the same documents, and responses to duplicative interrogatories, document requests, and requests for admission in jurisdictions around the country.[19] Absent transfer, the federal courts will need to administer—and several Defendants will need to defend—related actions across multiple venues,

---

the efficiencies of centralizing economic loss class actions with personal injury actions, explaining that liability discovery in all the cases will certainly overlap, and that, in our experience, the individual discovery required in personal injury actions is regularly and successfully coordinated within MDLs involving both kinds of action" (citations and internal quotation marks omitted)).

[17] *Id.* at 1381.

[18] *See* 28 U.S.C. § 1407.

[19] *See, e.g., In re Pilot Flying J Fuel Rebate Contract Litig. (No. II)*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) ("Centralization will avoid repetitive depositions of [the defendant's] officers and employees and duplicative document discovery regarding the alleged scheme.").

each potentially proceeding on a different pretrial schedule and subject to differing judicial decisions and local procedural requirements.

    None of the Actions has progressed to the point where any efficiencies will be forfeited through transfer and consolidation. This Panel has often recognized that consolidating litigation in one court benefits *both* plaintiffs and defendants by, for example, reducing discovery delays and costs for plaintiffs, and permitting plaintiffs' counsel to coordinate their efforts and share the pretrial workload.[20] As for the eight Defendants who are parties in more than one Action, depositions of expert witnesses will be coordinated, document production will be centralized, and travel for their current and former employees will be minimized since they will have to appear in only one location rather than in multiple districts across the country.

    Although Plaintiffs anticipate that there will be additional related cases filed, even the current level of litigation would benefit from transfer and coordination of proceedings.[21] Indeed,

---

[20] *See, e.g., In re Tribune Co. Fraudulent Conveyance Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011) ("[P]rudent counsel likely will combine their forces and apportion their workload in order to streamline the efforts of the parties, their counsel and the judiciary. This streamlining combined with uniform case management will lead to an overall savings in transaction costs. Given the number of pending actions, centralization likely will result in a significant savings of time and money for the parties and the courts." (citing *In re Lawnmower Engine Horsepower Mktg. and Sales Practices Litig.*, 588 F. Supp. 2d 1379 (J.P.M.L. 2008)); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001) (same).

[21] *See In re First Nat'l Collection Bureau, Inc.*, 11 F. Supp. 3d 1353, 1354 (J.P.M.L. 2014) (explaining that "[a]lthough there are relatively few parties and actions at present, efficiencies can be gained from having these actions proceed in a single district" by "eliminat[ing] duplicative discovery; prevent[ing] inconsistent pretrial rulings . . . and conserv[ing] the resources of the parties, their counsel and the judiciary"); *In re Hyundai & Kia Fuel Econ. Litig.*, 923 F. Supp. 2d 1364 (J.P.M.L. 2013) (creating multidistrict litigation for less than 15 pending actions); *In re Ford Motor Co. Defective Spark Plug & 3–Valve Engine Prods. Liab. Litig.*, 844 F. Supp. 2d 1375, 1376 (J.P.M.L. 2012) (granting transfer and consolidation of three cases); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 572 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008) (granting transfer and consolidation of three cases and six potential tag-alongs because of "overlapping and, often, nearly identical factual allegations that will likely require duplicative discovery and motion practice" and because

the Panel deemed transfer and consolidation appropriate in the analogous *Valsartan* litigation,[22] which at the time of transfer involved only ten pending actions.

## C.  Transfer will promote the just and efficient conduct of these Actions.

In determining whether a transfer would advance the just and efficient conduct of litigation, the Panel considers multiple factors, including (1) avoidance of conflicting rulings in various cases, (2) prevention of duplication of discovery on common issues, (3) avoidance of conflicting and duplicative pretrial conferences, (4) advancing judicial economy, and (5) reducing the burden on the parties by allowing division of workload among several attorneys.[23]

The consideration of these factors here strongly supports transfer. Plaintiffs are aware of fifteen Actions filed in nine different districts across the country, and there will likely be more filings in the coming weeks and months.[24] Thus, under the status quo, at least nine different federal district courts will be ruling on the many common factual and legal issues presented in the Actions and forthcoming tag-along actions. The presence of numerous counsel, plaintiffs, and

---

"[c]entralizing [the] actions under Section 1407 [would] ensure streamlined resolution of [the] litigation to the overall benefit of the parties and the judiciary").

[22] 363 F. Supp. 3d 1378.

[23] *See, e.g., In re Endangered Species Act Section 4 Deadline Litig.*, 716 F. Supp. 2d 1369, 1369 (J.P.M.L. 2010); *In re Bristol Bay*, *Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506 (J.P.M.L. 1976).

[24] *See, e.g.,* Amanda Bronstad, *Lawyer: 'Real Explosion' of Lawsuits Predicted Over Zantac*, LAW.COM (Oct. 25, 2019) ("'We'll see a real explosion of this litigation over the next four or five months,' said Brent Wisner, who was in Las Vegas this week speaking about Zantac lawsuits at the Mass Torts Made Perfect conference. . . . Wisner, of Los Angeles-based Baum Hedlund Aristei Goldman, predicted that the litigation could be huge, given that there are millions of customers of Zantac, which first sold in 1983. . . . 'This is [the] very, very, very beginning of this litigation,' [Wisner] said. 'The mechanism through which this causes cancer is pretty much rock solid at this point, the science is pretty overwhelming, and frankly, it's a very widely used drug. So we're going to have potentially hundreds and hundreds and hundreds of thousands of people who qualify for a lawsuit. In that context, it will dwarf what we saw in Roundup.'")

– 13 –

courts currently involved in this litigation creates a significant risk of conflicting rulings, which would potentially generate avoidable confusion and conflict among the parties, and could also impose inconsistent obligations on many Defendants.

The prospect of inconsistent rulings also encourages forum and judge shopping (including, for example, manipulation of varying discovery limits, approaches to electronically stored information, and protective orders). By contrast, a single judge presiding over an MDL would coordinate pretrial discovery and rule on pretrial motions in all of the federal cases at once, thus minimizing the potential for conflicting rulings and reducing the inconvenience of witnesses, the burdens on the federal judiciary, and the litigation's overall expense.[25]

**D. The proper transferee forum is the United States District Court for the District of New Jersey.**

In determining the most appropriate transferee forum under 28 U.S.C. § 1407, the Panel considers (among other things) the location of parties, witnesses, and documents; the convenience of the parties and witnesses; the progress achieved in the pending actions; the resources and experience of the transferee forum; and the preference of the majority of the parties.[26]

---

[25] *See, e.g., In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1405 (J.P.M.L. 2014) ("Issues concerning the development, manufacture, regulatory approval, labeling, and marketing of Xarelto . . . are common to all actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."); *In re Tylenol Mktg., Sales Practices & Prods. Liab. Litig.*, 936 F. Supp. 2d 1379, 1380 (J.P.M.L. 2013) ("Centralization will . . . prevent inconsistent pretrial rulings (on *Daubert* issues and other matters) . . . .").

[26] *See, e.g., In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1359 (J.P.M.L. 2017) (ordering transfer and considering parties' convenience, status of pending actions, and location); *In re Sprint Premium Data Plan Mktg. & Sales Practices Litig.*, 777 F. Supp. 2d 1349, 1351 (J.P.M.L. 2011) (concluding that District of New Jersey was "the most appropriate transferee district," noting that "[t]he district has a great deal of experience serving as a transferee court yet has a manageable MDL docket"); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (ordering transfer and noting that "majority of . . . parties ha[d] expressed a preference for" the transferee forum)

All of these factors cut in favor of selecting the District New Jersey as the transferee forum. Many Defendants—and thus many of the witnesses and relevant documents—are located either in the District of New Jersey or within 150 miles of the District. The other parties also will find the District of New Jersey a convenient forum because it is located in a major metropolitan area that is easy to travel to and provides ample travel accommodations.

1. **The District of New Jersey is the most appropriate transferee forum because the majority of the Actions name as Defendants companies that are based in the District of New Jersey.**

All fifteen Actions involve Sanofi US Services as a defendant, and nine of the Actions involve Sanofi-Aventis as a defendant. Both of these companies of are based in New Jersey. Significantly, these two New Jersey-based Sanofi Defendants currently control the U.S. rights to Zantac, and they manufactured and distributed the drug in the United States from about January 2017 until October 18, 2019, when the drug was recalled.

The Sanofi Defendants have purposefully availed themselves of the laws of New Jersey by running their business in the state. These Defendants' extensive connections to the state make the District of New Jersey an ideal venue for transfer.

2. **The District of New Jersey is the most appropriate transferee forum because it is the most geographically convenient location for the parties.**

The District of New Jersey also is the most appropriate forum based on accessibility. The District of New Jersey is a major metropolitan area that is easily accessible to three major airports— Newark Liberty International, John F. Kennedy International, and LaGuardia—and significant

Amtrak hubs.[27] In addition to being accessible, the district provides abundant travel accommodations for parties, counsel, and witnesses.[28]

Furthermore, the District of New Jersey's location will ensure convenient and efficient discovery more so than any other jurisdiction. As noted above, two of the Defendants that are parties to a majority of the Actions—Sanofi US Services and Sanofi-Aventis—are based in New Jersey. And three Defendants named in multiple Actions are located near the District of New Jersey and are also certain to have discoverable information relating to Zantac's chemical properties and other issues material to *all* of the Actions:

- Boehringer, which manufactured and sold Zantac in the United States from approximately January 2017 to January 2017, is a defendant in twelve of the fifteen Action and has its principal place of business in Ridgefield, Connecticut, which is only about 150 miles away from the District of New Jersey.
- Defendant Pfizer—which manufactured, marketed, and sold Zantac from 2000 through 2005—is a defendant in six of the fifteen Actions and is based in New York, which also is close to the District of New Jersey.
- GlaxoSmithKline, LLC, began marketing Zantac in the United States in the 1980s, is a defendants in seven of the fifteen Actions and is based in Philadelphia, less than ten miles from District Court for the District of New Jersey.

GlaxoSmithKline plc, a defendant in two of the Actions, is an English corporation with its principal place of business in England, and Sanofi S.A. (a defendant in four of the actions and also the parent company of Defendants Chattem, Sanofi US Services, and Sanofi-Aventis), is based in France. Thus, England and France will be sources of witnesses and documentary evidence.

---

[27] *See In re Laughlin Prods., Inc., Patent Litig.*, 240 F. Supp. 2d 1358, 1359 (J.P.M.L. 2003) (noting that the "appropriate transferee forum" was "an accessible metropolitan district where a constituent action [was] already pending").

[28] *See In re Enron Corp.*, 196 F. Supp. 2d at 1376–77 (selecting transferee forum in part because the litigation would "benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well developed support system for legal services").

New Jersey is a common first point of entry for many international travelers, and New Jersey is as close or closer to Europe than the other district courts in which Actions are pending. The District of New Jersey is therefore the most convenient location in which to centralize the Actions.

3. **The District of New Jersey is the most appropriate transferee forum because it has the necessary expertise and judicial resources to handle this litigation.**

In deciding whether transfer is appropriate, the Panel considers whether the potential transferee forum has the resources and expertise to manage consolidated litigation.[29] The District Court of New Jersey undoubtedly has the expertise and experience to handle this type of complex litigation, which involves numerous and dispersed litigants, including two overseas corporate Defendants. Numerous domestic and foreign corporations are headquartered in the District of New Jersey, including corporate behemoths such as Cognizant, Honeywell, Johnson & Johnson, Conduent, and Merck.[30] Given the large number of foreign and domestic companies headquartered in New Jersey, judges of the District Court for the District of New Jersey are well-versed in complex litigation including both domestic and foreign corporate defendants.

Significantly, numerous MDL cases involving—as this matter does—*both* consumer class actions and personal-injury actions stemming from unsafe pharmaceuticals or other consumer

---

[29] *See In re Ace Ltd. Secs. Litig.*, 370 F. Supp. 2d 1353, 1355 (J.P.M.L. 2005) (concluding that transferee forum was appropriate because, among other things, it "possess[ed] the necessary resources and expertise to be able to devote the time and effort to pretrial matters that [the] docket [was] likely to require").

[30] Chris Kolmar, *The 100 Largest Companies in New Jersey for 2019*, Zippia (May 17, 2019), https://www.zippia.com/advice/largest-companies-in-new-jersey/.

products have been transferred to the District of New Jersey.[31] Thus, the District of New Jersey

frequently is a transferee forum for complex litigation.[32]

The expertise of the District Court for the District of New Jersey in adjudicating these

complex matters is further highlighted by the district court's record of bringing complex MDL cases

to a final resolution. Since 1972, the court has resolved 66 MDL cases. The District of New Jersey

also efficiently processes its caseload: The median time from filing to disposition of civil matters

within the District is five months (the third shortest in the nation), and the portion of civil cases

pending for more than three years stands at 2.9% (the eighth lowest in the nation).[33] Taken

---

[31] *See, e.g., In re Valsartan.*, 363 F. Supp. 3d 1378 (transferring to District of New Jersey consumer class actions and personal-injury actions based on NDMA or NDEA impurities in blood-pressure drug valsartan); *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 261 F. Supp. 3d at 1353 (transferring to District of New Jersey personal-injury and wrongful-death actions alleging that proton-pump inhibitors caused kidney injuries); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 220 F. Supp. 3d 1356 (J.P.M.L. 2016) (transferring to District of New Jersey consumer class actions as well as personal-injury and wrongful-death actions involving cancer risk posed by products containing talcum powder); *In re Benicar Prods. Liab. Litig.*, 96 F. Supp. 3d 1381 (transferring to District of New Jersey personal-injury actions alleging that certain blood-pressure medications caused gastrointestinal injury); *In re Vytorin/Zetia Mktg., Sales Practices & Prod. Liab. Litig.*, 543 F. Supp. 2d 1378, 1380 (J.P.M.L. 2008) (transferring to District of New Jersey consumer class actions involving cholesterol-lowering pharmaceuticals).

[32] Chief Judge Freda L. Wolfson is currently presiding over all three of the Actions pending in the District of New Jersey (in the Trenton Division). Chief Judge Wolfson has experience handling MDL cases stemming from the manufacture and sale of unsafe pharmaceuticals and other consumer products. *See, e.g., In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, 3:16-md-2738 (D.N.J.) (active); *In re Plavix Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:13-cv-2418, MDL No. 2418 (D.N.J.) (active); *In re Fosamax (Alendronate Sodium) Products Liability Litigation (No. II)*, No. 3:08-cv8, MDL No. 2243 (D.N.J.) (closed).

There are of course other district judges in the Trenton Division of the District of New Jersey who likewise have experience handling pharmaceutical MDL cases. Judge Martinotti, for example, recently brought to resolution *In re Invokana (Canagliflozin) Products Liability Litigation*, No. 3:16-md-2750 (D.N.J.).

[33] *See Federal Court Management Statistics* (June 30, 2019), https://www.uscourts.gov/ sites/default/files/data_tables/fcms_na_distprofile0630.2019.pdf

together, these facts demonstrate the superior capability—regarding both experience and efficiency—of the District Court for the District of New Jersey to handle the Zantac/Ranitidine MDL litigation.

## IV.     CONCLUSION

Plaintiffs respectfully request that the Panel transfer to the District of New Jersey the twelve Actions not already located in that district, as well as any subsequently filed tag-along actions involving Zantac or generic ranitidine, and consolidate them with the three Actions already pending in the district for purposes of pretrial proceedings. The District of New Jersey is particularly well suited to handle these Actions and any forthcoming tag-along litigation.

Dated: November 4, 2019

Respectfully submitted,

By: */s/ Steve W. Berman*

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Jason A. Zweig
Zoran Tasić
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jasonz@hbsslaw.com
zorant@hbsslaw.com

*Attorneys for Plaintiffs Christina Garza,*
*Pankaj Khetarpal, Corina Lingerfelt, Justin Rowe,*
*Michael Burke, Stephanie Frasier, Richard Harris,*
*Jonathan Dimesky, Mohammed Haridi,*
*Mary Santorella, Kassie Benson, Lisa Prisinzano,*
*George Cravens, Donald Boland, Venus Sykes,*
*Jarquisha Harris, Ronald Maranto, Scott Moser,*

*Kileen Gromelski, Michael DeLuccia,*
*Paul Burpulis, and Fernando Zaragoza*

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

*Attorney for Plaintiffs Christina Garza,*
*Pankaj Khetarpal, Corina Lingerfelt, and*
*Justin Rowe*

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
& AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Attorney for Plaintiffs Mary Santorella,*
*Michael Burke, Stephanie Frazier, Richard Harris,*
*Kassie Benson, Lisa Prisinzano, George Cravens,*
*Donald Boland, Venus Sykes, Jarquisha Harris,*
*Ronald Maranto, Scott Moser, Kileen Gromelski,*
*Michael DeLuccia, and Paul Burpulis*

Robert C. Hilliard
HILLIARD MARTINEZ GONZALEZ L.L.P.
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com

*Attorney for Plaintiffs George Cravens,*
*Donald Boland, Venus Sykes, Jarquisha Harris,*
*Ronald Maranto, Scott Moser, Kileen Gromelski,*
*Michael DeLuccia, Fernando Zaragoza, and*
*Paul Burpulis*

Craig A. Raabe
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
craabe@ikrlaw.com

*Attorney for Plaintiffs Jonathan Dimesky,*
*Mohammed Haridi, Michael Burke,*
*Stephanie Frasier, Richard Harris,*
*George Cravens, Donald Boland, Venus Sykes,*
*Jarquisha Harris, Ronald Maranto, Scott Moser,*
*Kileen Gromelski, Michael DeLuccia,*
*Fernando Zaragoza, and Paul Burpulis*