CIVIL

# U.S. District Court
# Eastern District of California - Live System (Sacramento)
# CIVIL DOCKET FOR CASE #: 2:19-cv-02069-KJM-AC

Hansen v. Boehringer Ingelheim Pharmaceuticals, Inc. et al
Assigned to: District Judge Kimberly J. Mueller
Referred to: Magistrate Judge Allison Claire
Demand: $100,000,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/15/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Walter H. Hansen**

represented by **Michael L. Baum**
Baum Hedlund Aristei & Goldman
10940 Wilshire Blvd.
17th Floor
Los Angeles, CA 90024
310-207-3233-215
Fax: 310-820-7444
Email: mbaum@baumhedlundlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pedram Esfandiary**
Baum Hedlund Aristei and Goldman
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
310-207-3233
Fax: 310-820-7444
Email: pesfandiary@baumhedlundlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Brent Wisner**
Baum Hedlund Aristei & Goldman, P.C.
10940 Wilshire Blvd.
17th Floor
Los Angeles, CA 90024
310-207-3233
Fax: 310-820-7444
Email: rbwisner@baumhedlundlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Boehringer Ingelheim Pharmaceuticals, Inc.**

**Defendant**

**Sanofi US Services Inc.**

**Defendant**

**Chattem, Inc.**

**Defendant**

**GlaxoSmithKline, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/15/2019 | 1 | COMPLAINT against All Defendants by Walter H. Hansen. (Filing fee $ 400, receipt number 0972-8516607) (Attachments: # 1 Civil Cover Sheet)(Wisner, Robert) (Entered: 10/15/2019) |
| 10/16/2019 | 2 | SUMMONS ISSUED as to *Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., GlaxoSmithKline, LLC, Sanofi US Services Inc.* with answer to complaint due within *21* days. Attorney *Robert Brent Wisner* *Baum Hedlund Aristei & Goldman, P.C.* *10940 Wilshire Blvd., 17th Floor* *Los Angeles, CA 90024*. (Kaminski, H) (Entered: 10/16/2019) |
| 10/16/2019 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 3/5/2020 at 02:30 PM in Courtroom 3 (KJM) before District Judge Kimberly J. Mueller. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Kaminski, H) (Entered: 10/16/2019) |

Michael L. Baum, Esq. (SBN: 119511)
mbaum@baumhedlundlaw.com
Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
Bijan Esfandiari, Esq. (SBN: 223216)
pesfandiarv@baumhedlundlaw.com
Nicole K.H. Maldonado, Esq. (SBN 207715)
nmaldonado@baumhedlundlaw.com
Adam Foster (SBN: 301507)
afoster@baumhedlundlaw.com
Pedram Esfandiary, Esq. (SBN: 312569)
pesfandiarv@baumhedlundlaw.com
**BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.**
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| WALTER H. HANSEN, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; | |
| SANOFI US SERVICES INC.; | |
| CHATTEM, INC.; and | |
| GLAXOSMITHKLINE, LLC, | |
| Defendants. | |

1
COMPLAINT

1

## <u>TABLE OF CONTENTS</u>

2

Page

3   TABLE OF CONTENTS.................................................................................................2

4   INTRODUCTION ........................................................................................................3

5   PARTIES .....................................................................................................................3

6   JURISDICTION AND VENUE ...................................................................................4

7   FACTUAL ALLEGATIONS .......................................................................................5

8        I.      Brief History of Zantac and Ranitidine..........................................................5

9        II.      Dangers of NDMA.........................................................................................6

10       Figure 1 –Ranitidine Structure & Formation of NDMA ...............................10

11       III.      How Ranitidine Transforms into NDMA Within the Body..........................10

12       Figure 2 –Mechanism for Decomposition of Ranitidine in NDMA .............11

13       Table 1.  Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol...........12

14       Table 2.  Valisure Biologically relevant tests for NDMA formation .............13

15       Figure 3 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme.................16

16       Figure 4 – Expression levels of DDAH-1 enzyme by Organ .......................17

17       IV.      Defendants Knew of the NDMA Defect but Failed to Warn or Test ...........19

18       V.      Plaintiff-Specific Allegations......................................................................20

19       VI.      Exemplary / Punitive Damages Allegations .................................................21

20  TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL ......................................22

21  CAUSES OF ACTION ...............................................................................................22

22       COUNT I:  STRICT LIABILITY – DESIGN DEFECT ................................22

23       COUNT II:  STRICT LIABILITY – FAILURE TO WARN .........................26

24       COUNT III:  NEGLIGENCE .......................................................................30

25       COUNT IV:  BREACH OF EXPRESS WARRANTIES ...............................34

26       COUNT V:  BREACH OF IMPLIED WARRANTIES .................................36

27  JURY TRIAL DEMAND ...........................................................................................38

28  PRAYER FOR RELIEF .............................................................................................38

**INTRODUCTION**

1.      N-Nitrosodimethylamine ("NDMA") is a potent carcinogen.  It used to be a chemical biproduct of making rocket fuel in the early 1900s but, today, its only use is to induce tumors in animals as part of laboratory experiments.  Its *only* function is to cause cancer.  It has no business being in a human body.

2.      Zantac (chemically known as ranitidine), the popular antacid medication used by millions of people every day, leads to the production of staggering amounts of NDMA when it is digested by the human body.  The U.S. Food and Drug Administration's ("FDA") allowable daily limit of NDMA is 92 ng (nanograms) and yet, in a single dose of Zantac, researchers are discovering over 3 million ng.

3.      These recent revelations by independent researchers have caused widespread recalls of Zantac both domestically and internationally, and the FDA is actively investigating the issue, with is preliminary results showing "unacceptable" levels of NDMA.

4.      To be clear, this is not a contamination case—the levels of NDMA that researchers are seeing in Zantac is not the product of some manufacturing error.  The high levels of NDMA observed in Zantac are a function of the ranitidine molecule and the way it breaks down in the human digestive system.

5.      Plaintiff Walter H. Hansen took Zantac for about 9 years and, as a result, developed colorectal cancer, which in turn spread to his liver and lungs.  His cancer was caused by NDMA exposure created by the ingestion of Zantac.  This lawsuit seeks damages against the Defendants for causing his cancer.

**PARTIES**

6.      Plaintiff Walter H. Hansen (hereinafter "Plaintiff"), resides in Solano County, California.

7.       Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.  BI is a subsidiary of the German company Boehringer Ingelheim Corporation.  BI owned the U.S. rights to over-the-counter ("OTC") Zantac between December 2006 and January

2017, and manufactured and distributed the drug in the United States during that period.

8.      Defendant Sanofi US Services Inc., ("Sanofi") is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of Sanofi S.A.  Sanofi controlled the New Drug Application ("NDA") for OTC Zantac starting in January 2017 through the present.

9.      Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th Street Chattanooga, Tennessee 37409.  Chattem is a wholly owned subsidiary of Sanofi S.A., a French multinational corporation.  Chattem distributes OTC Zantac for Sanofi.

10.      Defendant GlaxoSmithKline, LLC ("GSK") is a Delaware corporation with its principal place of business located at 5 Crescent Drive, Philadelphia, Pennsylvania, 19112 and Five Moore Drive, Research Triangle, North Carolina, 27709.  GSK was the original innovator of the Zantac drug and controlled the NDA for prescription Zantac between 1983 and 2009.  By controlling the Zantac NDA it also directly controlled the labeling for all Zantac products through 2009.  And, GSK's negligence and misconduct related to Zantac as an innovator directly led to the failure to warn for other OTC versions of Zantac.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the parties.  In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

12.      This Court has personal jurisdiction over each Defendant insofar as each Defendants is authorized and licensed to conduct business in the State of California, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

13.      Additionally, the Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

1      14.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial

2    part of the events or omissions giving rise to this claim occurred within this judicial district.

3    **FACTUAL ALLEGATIONS**

**I.    Brief History of Zantac and Ranitidine**

15.    Zantac was developed by GlaxoSmithKline ("GSK") and approved for prescription use by the FDA in 1983.  The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.

16.    Due in large part to GSK's marketing strategy, Zantac was a wildly successful drug, reaching $1 billion in total sales in December 1986.  As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . .enabled the product to dominate the acid/peptic marketplace."[1]  Significantly, the marketing strategy that led to Zantac's success emphasized the purported safety of the drug.

17.    Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year.  Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

18.    On September 13, 2019, in response to a citizen's petition filed by Valisure, Inc. (discussed in detail below), U.S. and European regulators stated that they are reviewing the safety of ranitidine.

19.    On September 18, 2019, Novartis AG's Sandoz Unit, which makes generic drugs, stated that it was halting the distribution of its versions of Zantac in all markets, while Canada requested drug makers selling ranitidine to stop distribution.

---

[1] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MARKETING 4, 24 (Winter 1996).

20.     On September 28, 2019, CVS Health Corp. stated that it would stop selling Zantac and its own generic ranitidine products out of concern that it might contain a carcinogen.  CVS has been followed by Walmart, Inc., Walgreens Boot Alliance, and Rite Aid Corp. to also remove Zantac and ranitidine products.

21.     On October 2, 2019, the FDA stated that it was ordering all manufacturers of Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

22.     At no time did any Defendant attempt to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning.   Defendants had the ability to unilaterally add an NDMA and/or cancer warning to the Zantac label (for both prescription and OTC) without prior FDA approval pursuant to the Changes Being Effected regulation.  Had any Defendant attempted to add an NDMA warning to the Zantac label (either for prescription or OTC), the FDA would not have rejected it.

## II.     Dangers of NDMA

23.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes.  It is a member of N-nitrosamines, a family of potent carcinogens.  The dangers that NDMA poses to human health have long been recognized.  A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[2] NDMA is no longer produced or commercially used in the United States, except for research, such as a tumor initiator in certain animal bioassays.   In other words, it is only a poison.

24.     Both the Environmental Protection Agency ("EPA") and the International Agency for

---

[2] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents*, 405 MUTAT. RESEAR. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

1  Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.  And the

2  World Health Organization ("WHO") has stated that scientific testing indicates that NDMA

3  consumption is positively associated with either gastric or colorectal cancer and suggests that humans

4  may be especially sensitive to the carcinogenicity of NDMA.

5      25.    As early as 1980, consumer products containing unsafe levels of NDMA and other

6  nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

7      26.    Most recently, beginning in the summer of 2018, there have been recalls of several

8  generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and

9  irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's

10  safety standards.  The FDA has established a permissible daily intake limit for the probable human

11  carcinogen, NDMA, of 96 ng (nanogram).  However, the highest level of NDMA detected by the

12  FDA in any of the Valsartan tablets was 20.19 μg (or 20,190 ng) per tablet.   In the case of Valsartan,

13  the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only

14  *some* products containing valsartan.  Zantac poses a greater safety risk than any of the recently

15  recalled valsartan tablets.  Not only is NDMA a byproduct of the ranitidine molecule, itself, but the

16  levels observed in recent testing show NDMA levels in excess of 3,000,000 ng.

17      27.    Tobacco smoke also contains NDMA.  One filtered cigarette contains between 5 – 43

18  ng of NDMA.

19      28.    In mouse studies examining the carcinogenicity of NDMA through oral

20  administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.

21  In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung.  In

22  comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach.  In

23  comparable Guinea-pig studies, similar cancers were observed in the liver and lung.  In comparable

24  rabbit studies, similar cancers were observed in the liver and lung.

25      29.    In other long-term animal studies in mice and rats utilizing different routes of

26  exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was

27  observed in the lung, liver, kidney, nasal cavity, and stomach.

28      30.    Alarmingly, Zantac is in the FDA's category B for birth defects, meaning it is

1   considered safe to take during pregnancy.  However, in animal experiments, for those animals

2   exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and

3   kidneys.

4        31.    In addition, NDMA breaks down into various derivative molecules that, themselves,

5   are associated with causing cancer.  In animal studies, derivatives of NDMA induced cancer in the

6   stomach and intestine (including colon).

7        32.    Research shows that lower levels of NDMA, i.e., 40 ng, are fully metabolized in the

8   liver, but high does enter the body's general circulation.

9        33.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in

10  human and animal cells.

11       34.    Overall the animal data demonstrates that NDMA is carcinogenic in all animal species

12  tested: mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks,

13  mastomys, fish, newts, and frogs.

14       35.    Pursuant to the EPA" cancer guidelines, "tumors observed in animals are generally

15  assumed to indicate that an agent may produce tumors in humans."

16       36.    In addition to the overwhelming animal data linking NDMA to cancer, there are

17  numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.

18  And, while these studies (several discussed below) consistently show increased risks of various

19  cancers, the exposure levels considered in these studies are a very small fraction—as little as 1

20  millionth—the exposures noted in a single Zantac capsule, i.e., 0.191 ng/day (dietary) v. 304,500

21  ng/day (Zantac).

22       37.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with

23  220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in

24  persons exposed to more than 0.51 ng/day.[3]

25       38.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with

26

27  ─────────────────────────

28  [3] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in
    Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995).

─────────────────────────

8

COMPLAINT

1 | 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons

2 | exposed to more than 0.191 ng/day.[4]

3 |      39.    In another 1995 epidemiological case-control study looking at, in part, the effects of

4 | dietary consumption on cancer, researchers observed a statistically significant elevated risk of

5 | developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[5]

6 |      40.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189

7 | cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent

8 | carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing

9 | colorectal cancer.[6]

10 |      41.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in

11 | the rubber industry, researchers observed significant increased risks for NDMA exposure for

12 | esophagus, oral cavity, pharynx, prostate, and brain cancer.[7]

13 |      42.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268

14 | cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was

15 | significantly associated with increased cancer risk in men and women" for all cancers, and that

16 | "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[8]

---

[4] La Vecchia et al, *Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469–474 (1995).

[5] Rogers et al, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cancer*, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995).

[6] Knekt et al, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999)

[7] Straif et al, *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).

[8] Loh et al, *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).

**Figure 1 –Ranitidine Structure & Formation of NDMA**



43.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[9]

### III.    How Ranitidine Transforms into NDMA Within the Body

44.    The high levels of NDMA produced by Zantac are not caused by a manufacturing defect but are inherent to the molecular structure of ranitidine, the active ingredient in Zantac.  The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA.  *See* Fig. 1.  Thus, ranitidine produces NDMA by "react[ing] with itself", which means that *every dosage and form of ranitidine*, including Zantac, exposes users to NDMA.

---

[9]  Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 Br J Nutr. 6, 1109–1117 (2014).

45.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the American water supply.[10]  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater treatment plants was specifically linked to the presence of ranitidine.[11]

**Figure 2 –Mechanism for Decomposition of Ranitidine in NDMA**



46.    The high instability of the ranitidine molecule was further elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed, as shown in Figure 2 above.[12]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

47.    These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule.  Recent

---

[10] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. BIO. CHEM. 17, 10205-10209 (1989).
[11] Mitch et al, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 ENV. ENG. SCI. 5, 389-404 (2003).
[12] Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 *Environ. Sci. Technol.* 20, 11095-11103 (2012).

testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

48.    Valisure, LLC is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation recognizing the laboratories technical competence for regulatory.  Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market.  In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

49.    As part of its testing of Zantac, and other ranitidine products, in every lot tested, Valisure discovered exceedingly high levels of NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels.  As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[13]  The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1.  Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |

---

[13] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S.*

| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

50.    Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet.  Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at **28,000 times** the legal limit.  In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

51.    Valisure, however, was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol.  So, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

52.    Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach.  Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

53.    Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, etc.[14]

54.    The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| **Table 2.  Valisure Biologically relevant tests for NDMA formation** |

---

[14] *See, e.g.*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

| Ranitidine Tablet Studies | NDMA (ng/mL) | NDMA per tablet (ng) |
|---|---|---|
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

55.     Under biologically relevant conditions, when nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit.  In terms of smoking, one would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 ng level (over 7,000 for the 50 μg level).

56.     Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug.  Thus, higher levels of nitrites in patients regularly taking Zantac would be expected.

57.     In fact, NDMA formation in the stomach has been a concern for many years and specifically ranitidine has been implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.

58.     Existing research shows that ranitidine interacts with nitrites and acids in the chemical environment of the human stomach to form NDMA.  In *vitro tests* demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso derivatives) by interacting with gastric fluids in the human stomach, the by-product created is dimethylamine ("DMA") – which is an amine present in ranitidine itself.  When DMA is released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

59.     Moreover, in addition to the gastric fluid mechanisms investigated in the scientific

1    literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA

2    group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH") which can occur

3    in other tissues and organs separate from the stomach.

4        60.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present

5    on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways,

6    particularly in weak acidic conditions such as that in the kidney or bladder.  The original scientific

7    paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity

8    of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the

9    endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine

10   [NDMA]."[15]

11       61.    In Figure 3, below, computational modelling demonstrates that ranitidine (shown in

12   green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner

13   similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA,"

14   shown in blue).

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28   [15] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine*
     *dimethylaminohydrolase, from rat kidney*, 264 *J. Bio. Chem.* 17, 10205-10209 (1989).

**Figure 3 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**



62.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

63.    Figure 4 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.

**Figure 4 – Expression levels of DDAH-1 enzyme by Organ**



64.     DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate.  This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on the kidneys, specifically kidney cancer.

65.     In addition to the aforementioned *in vitro* studies that suggest a strong connection between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further weight to concern over this action and overall potential carcinogenicity.  A study published in the journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in combination with nitrite.  The authors of this study concluded: "Our experimental findings have shown that simultaneous oral administration in rats of high doses of ranitidine and NaNO2 [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[16]

66.     The human data, although limited at this point, is even more concerning.  A study

---

[16] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, 4 Carcinogenesis 10, 1281-1285 (1983).

1  completed and published in 2016 by Stanford University observed that healthy individuals, both male

2  and female, who ingested Zantac 150 mg tablets produced roughly 400 times elevated amounts of

3  NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[17]

4  Likely due to the perceived high safety profile of ranitidine, very few epidemiological studies have

5  been conducted on this drug.

6      67.    A 2004 study published by the National Cancer Institute investigated 414 cases of

7  peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[18]  One of the

8  variables investigated by the authors was the patients' consumption of a prescription antacid, either

9  Tagamet (cimetidine) or Zantac (ranitidine).  The authors concluded that "[r]ecent use of ulcer

10  treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this

11  association was independent of the elevated risk observed with gastric ulcers." Specifically, the

12  authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to

13  bladder cancer risk."  NDMA is among the most common of the N-Nitrosamines.

14      68.    A 1982 clinical study in rats compared ranitidine and cimetidine exposure in

15  combination with nitrite.  When investigating DNA fragmentation in the rats' livers, no effect was

16  observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a

17  significant DNA fragmentation.[19]

18      69.    Investigators at Memorial Sloan Kettering Cancer Center are actively studying

19  ranitidine to evaluate the extent of the public health implications of these findings.  Regarding

20  ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine is

21  concerning, particularly considering the widespread use of this medication. Given the known

22  carcinogenic potential of NDMA, this finding may have significant public health implications[.]"

---

[17] Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016).

[18] Michaud et al, *Peptic ulcer disease and the risk of bladder cancer in a prospective study of male health professionals*, 13 CANCER EPIDEMIOL BIOMARKERS PREV. 2, 250-254 (2004).

[19] Brambilla et al, *Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance*, Nicolini C. (eds) Chemical Carcinogenesis. NATO Advanced Study Institutes Series (Series A: Life Sciences), Vol 52. Springer, Boston, MA (1982).

**IV.     Defendants Knew of the NDMA Defect but Failed to Warn or Test**

70.     During the time that Defendants manufactured and sold Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

71.     Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.  This was known or should have been known by Defendants.

72.     Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

73.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

74.     The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

75.     "The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product."  21 C.F.R. § 314.81(b)(2)(v).

76.     Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

77.     Defendants never provided the relevant studies to the FDA, nor did they present to the

1   FDA with a proposed disclosure noting the link between ranitidine and NDMA.

2          78.     In a 1981 study published by GSK, the originator of the ranitidine molecule, the

3   metabolites of ranitidine in urine were studied using liquid chromatography.[20]  Many metabolites were

4   listed, though there is no indication that NDMA was looked for.  Plaintiffs believe this was

5   intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.

6          79.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso

7   compounds (discussed previously), GSK published a clinical study specifically investigating gastric

8   contents in human patients and N-nitroso compounds.[21]  This study specifically indicated that there

9   were no elevated levels of N-nitroso compounds (of which NDMA is one).  However, the study was

10  rigged to fail.  It used an analytical system called a "nitrogen oxide assay" for the determination of N-

11  nitrosamines, which was developed for analyzing food and is a detection method that indirectly and

12  non-specifically measures N-nitrosamines.  Furthermore, in addition to this approach being less

13  accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples

14  with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."  So,

15  without the chemical being present in any sample, any degradation into NDMA could not, by design,

16  be observed.  Again, this spurious test was intentional and designed to mask any potential cancer risk.

17         80.     There are multiple alternatives to Zantac that do not pose the same risk, such as

18  Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and

19  Lansoprazole (Prevacid).

20  **V.     Plaintiff-Specific Allegations**

21         81.     Plaintiff began using over-the-counter brand name Zantac in 2010 and continued to

22  use it through 2019.  He took 150 mg per day.

23         82.     In 2017, Plaintiff was diagnosed with colorectal cancer, which later spread to this

24

25  _____

26  [20] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-
          pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. &
27        APPL. 1, 161-168 (1981).

    [21] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric
28        contents*, 6 GUT. Vol. 28, 726-738 (1987).

1   liver and lungs.

2       83.    Based on prevailing scientific evidence, exposure to Zantac (and the attendant

3   NDMA) can cause colorectal, liver, and lung cancer in humans.

4       84.    Plaintiff's cancer was caused by ingestion of Zantac.

5       85.    Had any Defendant warned Plaintiff that Zantac could lead to exposure to NDMA or,

6   in turn, cancer, Plaintiff would not have taken Zantac.

7       86.    Plaintiff did not learn of the link between his cancer and Zantac exposure until

8   October 3, 2019, when he learned that Zantac contained high levels of NDMA in a podcast.

9       87.    After being diagnosed with cancer, Plaintiff investigated what could have caused his

10  cancer, but to no avail until recently when he heard about the connection of Zantac to NDMA and

11  cancer.

12  **VI.    Exemplary / Punitive Damages Allegations**

13      88.    Defendants' conduct as alleged herein was done with reckless disregard for human

14  life, oppression, and malice.  Defendants were fully aware of the safety risks of Zantac, particularly

15  the carcinogenic potential of Zantac as it transforms into NDMA within the chemical environment of

16  the human body.  Nonetheless, Defendants deliberately crafted their label, marketing, and promotion

17  to mislead consumers.

18      89.    This was not done by accident or through some justifiable negligence.  Rather,

19  Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to

20  humans, and that full disclosure of the true risks of Zantac would limit the amount of money

21  Defendants would make selling Zantac. Defendants' object was accomplished not only through its

22  misleading label, but through a comprehensive scheme of selective misleading research and testing,

23  false advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiff

24  was denied the right to make an informed decision about whether to purchase and use Zantac,

25  knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of

26  Plaintiff's rights.

27      90.    Accordingly, Plaintiff requests punitive damages against Defendants for the harms

28  caused to Plaintiff.

## **TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL**

91.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Zantac is injurious to human health.

92.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of Zantac, nor would a reasonable and diligent investigation by Plaintiff have disclosed that Zantac would cause Plaintiff's illnesses.

93.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' misrepresentations and concealment.  Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of Zantac.

94.     As a result of Defendants' actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

95.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Zantac.  Defendants had a duty to disclose the true character, quality and nature of Zantac because this was non-public information over which Defendants continue to have control.  Defendants knew that this information was not available to Plaintiff, Plaintiff's medical providers and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiff.

96.     Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## **CAUSES OF ACTION**

**COUNT I:  STRICT LIABILITY – DESIGN DEFECT**

97.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as

1  if fully stated herein.

2      98.    Plaintiff brings this strict liability claim against Defendants for defective design.

3      99.    At all relevant times, Defendants engaged in the business of testing, developing,

4  designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are

5  defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac

6  products into the stream of commerce.  These actions were under the ultimate control and supervision

7  of Defendants.  At all relevant times, Defendants designed, researched, developed, manufactured,

8  produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the

9  Zantac products used by Plaintiff, as described herein.

10      100.    At all relevant times, Defendants' Zantac products were manufactured, designed, and

11  labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or

12  exposure to the public, including Plaintiff.

13      101.    At all relevant times, Defendants' Zantac products reached the intended consumers,

14  handlers, and users or other persons coming into contact with these products within this judicial

15  district and throughout the United States, including Plaintiff, without substantial change in their

16  condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.  At all

17  relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold

18  Zantac products within this judicial district and aimed at a consumer market within this judicial

19  district.  Defendants were at all relevant times involved in the retail and promotion of Zantac products

20  marketed and sold in this judicial district.

21      102.    Defendants' Zantac products, as researched, tested, developed, designed, licensed,

22  manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in

23  design and formulation in that, when they left the control of Defendants' manufacturers and/or

24  suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an

25  ordinary consumer would contemplate.

26      103.    Defendants' Zantac products, as researched, tested, developed, designed, licensed,

27  manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in

28  design and formulation in that, when they left the hands of Defendants' manufacturers and/or

suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

104.    At all relevant times, Defendants knew or had reason to know that Zantac products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

105.    Therefore, at all relevant times, Defendants' Zantac products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendants' Zantac products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.    When placed in the stream of commerce, Defendants' Zantac products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.    When placed in the stream of commerce, Defendants' Zantac products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.    Defendants did not sufficiently test, investigate, or study its Zantac products and, specifically, the ability for Zantac to transform into the carcinogenic compound NDMA within the human body;

e.    Exposure to Zantac products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

f.    Defendants knew or should have known at the time of marketing Zantac products that exposure to Zantac could result in cancer and other severe illnesses and injuries;

g.    Defendants did not conduct adequate post-marketing surveillance of its Zantac products; and

h.    Defendants could have employed safer alternative designs and formulations.

1    106.    Plaintiff used and was exposed to Defendants' Zantac products without knowledge of

2  Zantac's dangerous characteristics.

3    107.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of

4  Defendants' Zantac products in an intended or reasonably foreseeable manner without knowledge of

5  Zantac's dangerous characteristics.

6    108.    Plaintiff could not reasonably have discovered the defects and risks associated with

7  Zantac products before or at the time of exposure due to the Defendants' suppression or obfuscation

8  of scientific information linking Zantac to cancer.

9    109.    The harm caused by Defendants' Zantac products far outweighed their benefit,

10  rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer

11  would contemplate.  Defendants' Zantac products were and are more dangerous than alternative

12  products, and Defendants could have designed Zantac products to make them less dangerous. Indeed,

13  at the time Defendants designed Zantac products, the state of the industry's scientific knowledge was

14  such that a less risky design or formulation was attainable.

15    110.    At the time Zantac products left Defendants' control, there was a practical, technically

16  feasible and safer alternative design that would have prevented the harm without substantially

17  impairing the reasonably anticipated or intended function of Defendants' Zantac products.  For

18  example, the Defendants could have added ascorbic acid (Vitamin C) to each dose of Zantac, which

19  is known to scavenge nitrites and reduce the ability of the body to recombine ranitidine into

20  NDMA.[22]

21    111.    Defendants' defective design of Zantac products was willful, wanton, malicious, and

22  conducted with reckless disregard for the health and safety of users of the Zantac products, including

23  Plaintiff.

24

25  _____

26  [22] *See, e.g.*, Vermeer, et al., *Effect of ascorbic acid and green tea on endogenous formation of N
nitrosodimethylamine and N-nitrosopiperidine in humans*. 428 MUTAT. RES., FUNDAM. MOL. MECH.

27  MUTAGEN. 353–361 (1999); Garland et al., *Urinary excretion of nitrosodimethylamine and
nitrosoproline in humans: Interindividual and intraindividual differences and the effect of*

28  *administered ascorbic acid and α-tocopherol*, 46 CANCER RESEARCH 5392–5400 (1986).

112.    Therefore, as a result of the unreasonably dangerous condition of their Zantac products, Defendants are strictly liable to Plaintiff.

113.    The defects in Defendants' Zantac products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

114.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Zantac products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

115.    As a direct and proximate result of Defendants placing its defective Zantac products into the stream of commerce, and the resulting injuries, Plaintiff sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

116.    As a proximate result of Defendants placing its defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff has suffered great mental anguish and other personal injury and damages.

117.    As a proximate result of the Defendants placing its defective Zantac products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income and/or loss of earning capacity.

118.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT II:  STRICT LIABILITY – FAILURE TO WARN**

119.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

120.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

121.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products which are

1  defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain

2  adequate warnings or instructions concerning the dangerous characteristics of Zantac and NDMA.

3  These actions were under the ultimate control and supervision of Defendants.  At all relevant times,

4  Defendants registered, researched, manufactured, distributed, marketed, and sold Zantac and other

5  ranitidine formulations within this judicial district and aimed at a consumer market.  Defendants were

6  at all relevant times involved in the retail and promotion of Zantac products marketed and sold in in

7  this judicial district.

8      122.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled,

9  distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Zantac

10  products, and in the course of same, directly advertised or marketed the products to consumers and

11  end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of

12  Zantac products.

13      123.    At all relevant times, Defendants had a duty to properly test, develop, design,

14  manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide

15  proper warnings, and take such steps as necessary to ensure its Zantac products did not cause users

16  and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to

17  warn Plaintiff of dangers associated with Zantac.  Defendants, as a manufacturer, seller, or distributor

18  of pharmaceutical medication, are held to the knowledge of an expert in the field.

19      124.    At the time of manufacture, Defendants could have provided the warnings or

20  instructions regarding the full and complete risks of Zantac products because they knew or should

21  have known of the unreasonable risks of harm associated with the use of and/or exposure to such

22  products.

23      125.    At all relevant times, Defendants failed and deliberately refused to investigate, study,

24  test, or promote the safety or to minimize the dangers to users and consumers of their product and to

25  those who would foreseeably use or be harmed by Defendants' Zantac products, including Plaintiff.

26      126.    Even though Defendants knew or should have known that Zantac posed a grave risk of

27  harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and

28  exposure. The dangerous propensities of their products and the carcinogenic characteristics of

1    NDMA as produced within the human body as a result of ingesting Zantac, as described above, were

2    known to Defendants, or scientifically knowable to Defendants through appropriate research and

3    testing by known methods, at the time they distributed, supplied or sold the product, and were not

4    known to end users and consumers, such as Plaintiff.

5        127.    Defendants knew or should have known that their products created significant risks of

6    serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn

7    consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products.  Defendants

8    have wrongfully concealed information concerning the dangerous nature of Zantac and the potential

9    for ingested Zantac to transform into the carcinogenic NDMA compound, and further, have made

10   false and/or misleading statements concerning the safety of Zantac products.

11       128.    At all relevant times, Defendants' Zantac products reached the intended consumers,

12   handlers, and users or other persons coming into contact with these products within this judicial

13   district and throughout the United States, including Plaintiff, without substantial change in their

14   condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

15       129.    Plaintiff was exposed to Defendants' Zantac products without knowledge of their

16   dangerous characteristics.

17       130.    At all relevant times, Plaintiff used and/or was exposed to the use of Defendants'

18   Zantac products while using them for their intended or reasonably foreseeable purposes, without

19   knowledge of their dangerous characteristics.

20       131.    Plaintiff could not have reasonably discovered the defects and risks associated with

21   Zantac products prior to or at the time of Plaintiff consuming Zantac.  Plaintiff relied upon the skill,

22   superior knowledge, and judgment of Defendants to know about and disclose serious health risks

23   associated with using Defendants' products.

24       132.    Defendants knew or should have known that the minimal warnings disseminated with

25   their Zantac products were inadequate, failed to communicate adequate information on the dangers

26   and safe use/exposure, and failed to communicate warnings and instructions that were appropriate

27   and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

28       133.    The information that Defendants did provide or communicate failed to contain

relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Zantac; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac.

134.    This alleged failure to warn is not limited to the information contained on Zantac's labeling.  The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Zantac through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources.  But the Defendants did not disclose these known risks through any medium.

135.    Defendants are liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of Zantac.

136.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Zantac products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative medication.

137.    As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

138.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

139.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income and/or loss of earning capacity.

140.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in

COMPLAINT

1   Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred,

2   attorneys' fees and all such other and further relief as this Court deems just and proper.

3   **COUNT III:  NEGLIGENCE**

4       141.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as

5   if fully stated herein.

6       142.    Defendants, directly or indirectly, caused Zantac products to be sold, distributed,

7   packaged, labeled, marketed, promoted, and/or used by Plaintiff.  At all relevant times, Defendants

8   registered, researched, manufactured, distributed, marketed and sold Zantac within this judicial

9   district and aimed at a consumer market within this district.

10      143.    At all relevant times, Defendants had a duty to exercise reasonable care in the design,

11  research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution

12  of Zantac products, including the duty to take all reasonable steps necessary to manufacture, promote,

13  and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

14      144.    At all relevant times, Defendants had a duty to exercise reasonable care in the

15  marketing, advertisement, and sale of the Zantac products. Defendants' duty of care owed to

16  consumers and the general public included providing accurate, true, and correct information

17  concerning the risks of using Zantac and appropriate, complete, and accurate warnings concerning the

18  potential adverse effects of Zantac and, in particular, its ability to transform into the carcinogenic

19  compound NDMA.

20      145.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should

21  have known of the hazards and dangers of Zantac and, specifically, the carcinogenic properties of

22  NDMA when Zantac is ingested.

23      146.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable

24  care, should have known that use of Zantac products could cause or be associated with Plaintiff's

25  injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products,

26  including Plaintiff.

27      147.    Defendants also knew or, in the exercise of reasonable care, should have known that

28  users and consumers of Zantac were unaware of the risks and the magnitude of the risks associated

with use of Zantac.

148.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac products, in that Defendants manufactured and produced defective Zantac which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.  Indeed, Defendants deliberately refused to test Zantac products because they knew that the chemical posed serious health risks to humans.

149.    Defendants were negligent in their promotion of Zantac, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac, including the internet, television, print advertisements, etc.  Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Zantac in their promotional efforts, outside of the context of labeling.

150.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so.  Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of Zantac.

151.    Defendants' negligence included:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and the carcinogenic potential of NDMA as created in the human body as a result of ingesting

31

COMPLAINT

Zantac, and, consequently, the risk of serious harm associated with human use of Zantac;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zantac products were safe for their intended consumer use;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Zantac products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e. Failing to design and manufacture Zantac products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of Zantac presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac products;

j. Representing that their Zantac products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Zantac products' labeling or other promotional materials that would alert consumers and the general public of the risks of Zantac;

l. Advertising, marketing, and recommending the use of the Zantac products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Zantac;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Zantac products are not unsafe for regular consumer use; and

n.   Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

152.   Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Zantac.

153.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Zantac.

154.   Defendants' negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendants' negligence, Plaintiff would not have developed cancer.

155.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

156.   As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

157.   As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

158.   As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, and loss of earning capacity.

159.   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

1    **COUNT IV:  BREACH OF EXPRESS WARRANTIES**

2    160.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as

3    if fully stated herein.

4    161.    At all relevant times, Defendants engaged in the business of testing, developing,

5    designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are

6    defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac

7    products into the stream of commerce.  These actions were under the ultimate control and supervision

8    of Defendants.

9    162.    Defendants had a duty to exercise reasonable care in the research, development,

10   design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion,

11   sale, and release of Zantac products, including a duty to:

12       a.    ensure that its products did not cause the user unreasonably dangerous side effects;

13       b.    warn of dangerous and potentially fatal side effects; and

14       c.    disclose adverse material facts, such as the true risks associated with the use of and

15          exposure to Zantac, when making representations to consumers and the general public,

16          including Plaintiff.

17   163.    As alleged throughout this pleading, the ability of Defendants to properly disclose

18   those risks associated with Zantac is not limited to representations made on the labeling.

19   164.    At all relevant times, Defendants expressly represented and warranted to the

20   purchasers of its products, by and through statements made by Defendants in labels, publications,

21   package inserts, and other written materials intended for consumers and the general public, that

22   Zantac products were safe to human health and the environment, effective, fit, and proper for their

23   intended use.  Defendants advertised, labeled, marketed, and promoted Zantac products, representing

24   the quality to consumers and the public in such a way as to induce their purchase or use, thereby

25   making an express warranty that Zantac products would conform to the representations.

26   165.    These express representations include incomplete warnings and instructions that

27   purport, but fail, to include the complete array of risks associated with use of and/or exposure to

28   Zantac.  Defendants knew and/or should have known that the risks expressly included in Zantac

1  warnings and labels did not and do not accurately or adequately set forth the risks of developing the

2  serious injuries complained of herein.  Nevertheless, Defendants expressly represented that Zantac

3  products were safe and effective, that they were safe and effective for use by individuals such as the

4  Plaintiff, and/or that they were safe and effective as consumer medication.

5          166.    The representations about Zantac, as set forth herein, contained or constituted

6  affirmations of fact or promises made by the seller to the buyer, which related to the goods and

7  became part of the basis of the bargain, creating an express warranty that the goods would conform to

8  the representations.

9          167.    Defendants placed Zantac products into the stream of commerce for sale and

10 recommended their use to consumers and the public without adequately warning of the true risks of

11 developing the injuries associated with the use of Zantac.

12         168.    Defendants breached these warranties because, among other things, Zantac products

13 were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate

14 nature of the risks associated with their use, and were not merchantable or safe for their intended,

15 ordinary, and foreseeable use and purpose.  Specifically, Defendants breached the warranties in the

16 following ways:

17             a.  Defendants represented through its labeling, advertising, and marketing materials that

18                 Zantac products were safe, and intentionally withheld and concealed information

19                 about the risks of serious injury associated with use of Zantac and by expressly

20                 limiting the risks associated with use within its warnings and labels; and

21             b.  Defendants represented that Zantac products were safe for use and intentionally

22                 concealed information that demonstrated that Zantac, by transforming into NDMA

23                 upon human ingestion, had carcinogenic properties, and that Zantac products,

24                 therefore, were not safer than alternatives available on the market.

25         169.    Plaintiff detrimentally relied on the express warranties and representations of

26 Defendants concerning the safety and/or risk profile of Zantac in deciding to purchase the product.

27 Plaintiff reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects

28 of Zantac.  Plaintiff would not have purchased or used Zantac had Defendants properly disclosed the

risks associated with the product, either through advertising, labeling, or any other form of disclosure.

170.    Defendants had sole access to material facts concerning the nature of the risks associated with its Zantac products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Zantac warnings and labels were inadequate and inaccurate.

171.    Plaintiff had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Zantac.

172.    Plaintiff used and/or was exposed to Zantac as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

173.    Had the warnings, labels, advertisements, or promotional material for Zantac products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

174.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

175.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

176.    As a proximate result of Defendants' breach of express warranty, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

177.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

**COUNT V: BREACH OF IMPLIED WARRANTIES**

178.    Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

179.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac products into the stream of commerce.

180.    Before the time Plaintiff used Zantac products, Defendants impliedly warranted to its consumers, including Plaintiff, that Zantac products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

181.    But Defendants failed to disclose that Zantac has dangerous propensities when used as intended and that use of Zantac products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

182.    Plaintiff was an intended beneficiary of the implied warranties made by Defendants to purchasers of its Zantac products.

183.    The Zantac products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

184.    At all relevant times, Defendants were aware that consumers and users of its products, including Plaintiff, would use Zantac products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Zantac.

185.    Defendants intended that Zantac products be used in the manner in which Plaintiff, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Zantac was not adequately tested or researched.

186.    In reliance upon Defendants' implied warranty, Plaintiff used Zantac as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

187.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Zantac.

188.    Defendants breached their implied warranty to Plaintiff in that Zantac products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Zantac has

COMPLAINT

dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

189.    The harm caused by Defendants' Zantac products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

190.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

191.    As a proximate result of the Defendants' breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

192.    As a proximate result of Defendants' breach of implied warranty, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

193.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

194.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

195.    WHEREFORE, Plaintiff requests the Court to enter judgment in Plaintiff's favor and against the Defendants for:

c.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

d.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

e.    pre-judgment and post-judgment interest;

f.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

COMPLAINT

1      g.   any other relief the Court may deem just and proper.

2

3   Dated:  October 15, 2019                    **BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.**

4

5                                              /s/ R. Brent Wisner
                                               Brent Wisner, Esq. (SBN: 276023)
6                                              rbwisner@baumhedlundlaw.com
                                               Michael L. Baum, Esq. (SBN: 119511)
7                                              mbaum@baumhedlundlaw.com
                                               Bijan Esfandiari, Esq. (SBN: 223216)
8                                              pesfandiarv@baumhedlundlaw.com
                                               Nicole K.H. Maldonado, Esq. (SBN 207715)
9                                              nmaldonado@baumhedlundlaw.com
                                               Adam Foster (SBN: 301507)
10                                             afoster@baumhedlundlaw.com
                                               Pedram Esfandiary, Esq. (SBN: 312569)
11                                             pesfandiarv@baumhedlundlaw.com
                                               **BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.**
12                                             10940 Wilshire Blvd., 17th Floor
                                               Los Angeles, CA 90024
13                                             Telephone:  (310) 207-3233
                                               Facsimile:   (310) 820-7444
14

15

16                                             *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT