**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: ZANTAC/RANITIDINE NDMA LITIGATION | )<br>) | MDL No. 2924 |

**DEFENDANTS BOEHRINGER INGELHEIM, GSK, PFIZER, AND SANOFI'S RESPONSE TO**
**<u>MOTION FOR TRANSFER AND CONSOLIDATION UNDER 28 U.S.C. § 1407</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ......................................................................................................................... 4

I.      The Related Actions Should Be Centralized in the District of New Jersey ...................... 4

        A.      Centralization is Appropriate. ................................................................................ 5

        B.      The MDL Should be Transferred to the District of New Jersey. ........................... 7

                1.      The District of New Jersey is a Convenient Forum. .................................... 7

                2.      The Highest Number of Plaintiffs Have Filed in the District of
                        New Jersey. ................................................................................................ 8

                3.      All District of New Jersey Cases Have Been Assigned to the Same
                        Judge, and That Judge Should Be Assigned this MDL. ............................. 9

II.     Alternatively, the Southern District of New York Is An Appropriate Venue. ................ 10

III.    As Compared to the District of New Jersey or the Southern District of New York,
        the Other Proposed Venues Are Less Convenient or Appropriate. ................................ 11

        A.      The Southern District of Florida Is Not A More Appropriate Venue. ................. 11

        B.      The District of New Jersey's Camden Division Is Not A More Appropriate
                Venue. ................................................................................................................... 11

        C.      Neither the Eastern District of Tennessee Nor the Middle District of
                Tennessee Is A More Appropriate Venue. ........................................................... 13

        D.      The Northern District of Illinois Is Not a More Appropriate Venue. .................. 13

        E.      The Northern District of California Is Not A More Appropriate Venue. ............. 14

CONCLUSION ................................................................................................................... 15

Defendants Sanofi U.S. Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc. (collectively, "Sanofi"); Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"); GlaxoSmithKline LLC ("GSK"); and Pfizer Inc. ("Pfizer") (collectively, "Defendants") respectfully submit this response to the Motion for Transfer Pursuant to 28 U.S.C. § 1407.  Defendants agree that the Panel should centralize this litigation in the District of New Jersey, and suggest that the MDL be assigned to the Honorable Freda L. Wolfson, an experienced MDL judge currently overseeing all of the Zantac actions already pending in that jurisdiction.

## INTRODUCTION

All indications are that the Zantac litigation will be complex and hard-fought litigation. Zantac has been a popular over-the-counter medication for decades, and four major pharmaceutical companies have had responsibility for the medication in the United States over the past 35 years.  Defendants will vigorously contest plaintiffs' inflammatory allegations regarding the medicine.  Those allegations are premised on the findings of a single online pharmacy, Valisure, which recently filed a citizen petition with the FDA asserting that it tested samples of Zantac and found excessive levels of the chemical NDMA, which Valisure claimed was a possible human carcinogen.  Although the FDA criticized both Valisure's methodology and test results and indicated that the FDA's preliminary testing contradicts Valisure's findings, Valisure's citizen petition immediately triggered an avalanche of litigation.  There are now over a dozen putative class-action complaints pending around the country and dozens of additional personal injury claimants, with more lawsuits threatened.

No one disputes that these cases should be centralized into an MDL; the only real questions are where and before whom.

In these circumstances, the District of New Jersey is the most appropriate forum for centralization.  That District is where the most Zantac-related claims are pending.  Sanofi—

1

which currently holds the rights to distribute Zantac—also is headquartered in New Jersey, and the other defendants reside close by.  Countless documents and witnesses will be located in New Jersey or nearby.  The forum is also easy to reach, with New York to the north and Philadelphia to the west.  Notably, most other plaintiffs who have taken a position on centralization have agreed that the District of New Jersey is an appropriate forum.[1]  Although some plaintiffs suggest that centralization should occur in other venues, none is as convenient or appropriate as New Jersey.

In addition, all of the cases in that District are already assigned to a judge who is highly qualified to manage these cases.  As this Panel has previously recognized, Judge Wolfson is an "experienced MDL judge," *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 220 F. Supp. 3d 1356, 1359 (U.S. Jud. Pan. Mult. Lit. 2016), and she has substantial expertise handling complex pharmaceutical litigation.  Judge Wolfson's extensive experience with similar MDLs makes her the ideal transferee judge for what will likely be a complex and challenging litigation to manage.

The Panel should therefore centralize these cases in the District of New Jersey and appoint Judge Wolfson to preside over this MDL.

## FACTUAL BACKGROUND

Since it was approved by the FDA in 1983, ranitidine has been used to treat stomach ulcers, gastroesophageal reflux disease, and other stomach- and esophagus-related conditions. *See* Compl. ¶ 47, *Garza v. Sanofi-Aventis U.S. LLC et al.*, No. 5:19-cv-05772.  Zantac, the name

---

[1] *See McDonald* Plaintiff's Response, Dkt. No. 9, at 5 ("the District of New Jersey is a logical choice as transferee court"); *Hansen* Plaintiffs' Response, Dkt. No. 19 at 15 ("Plaintiffs do not oppose centralization of these cases in the District of New Jersey" and agree that New Jersey "is an excellent venue"); *Combs* Plaintiffs' Response, Dkt. No. 61 at 1 ("the most appropriate venue to conduct pretrial proceedings is the District of New Jersey").

brand name version of ranitidine, was approved for over-the-counter use in 1995.  *See id.* ¶ 49.

Sanofi, the current rights holder for over-the-counter Zantac, has its U.S. headquarters in New

Jersey.  The rights to manufacture and distribute Zantac over-the-counter in the United States

originally rested with GSK, subsequently passed to Pfizer (or its affiliates), eventually went to

BI, before Sanofi recently assumed the rights in 2017.

On September 13, 2019, Valisure, an online pharmacy, filed a citizen petition with the

FDA claiming that its testing of ranitidine revealed high levels of the chemical NDMA, which

plaintiffs allege is a human carcinogen.  *Id.* ¶¶ 3-6.  Valisure's findings already have been called

into question by the FDA.  Soon after it began looking into the petition's claims, the FDA

released a statement criticizing Valisure's testing method as "not suitable for testing ranitidine"

because it "uses higher temperatures" than are generally acceptable, and those higher

temperatures "generated very high levels of NDMA from ranitidine products."[2]  Ex. A.  Later,

on November 1, 2019, the FDA released a summary of its preliminary test results.[3]  Ex. B.  The

FDA "found levels of NDMA in ranitidine that are similar to the levels you would expect to be

exposed to if you ate common foods like grilled or smoked meats."  *Id.*  The FDA further

"conducted tests that simulate what happens to ranitidine after it has been exposed to acid in the

stomach with a normal diet and results of these tests indicate that NDMA is not formed through

this process."  *Id.*  The FDA also concluded that "if ranitidine is exposed to a simulated small

intestine environment, NDMA is not formed."  *Id.*  This debate foreshadows what will be a

---

[2] *UPDATE - FDA provides update on testing of ranitidine for NDMA impurities*, Food & Drug Admin. (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (last accessed November 26, 2019.)

[3] Janet Woodcock, *Statement on new testing results, including low levels of impurities in ranitidine drugs*, Food & Drug Admin. (Nov. 1, 2019), https://www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs (last accessed November 26, 2019).

critical substantive issue in these cases:  whether there is any reliable scientific proof of a link between ranitidine and cancer in humans.

Despite the controversy surrounding its claims, Valisure's citizen petition prompted a wave of personal injury and putative class action lawsuits, with the first complaint filed the same day the petition was made public.  To date, 30 personal injury cases with 42 plaintiffs have been filed in 13 different federal courts, and 15 putative class actions have been filed in nine different courts.  The largest percentage of these plaintiffs—21%—have filed their actions in the District of New Jersey, where they all have been assigned to Judge Wolfson.

All of these actions arise out of the same central allegation:  that Zantac use purportedly causes unsafe levels of NDMA, and that the defendants should have warned about this purported risk at some point in the past.  The personal injury claimants allege that they developed various cancers as a result of taking Zantac.  The putative class representatives do not allege that they have suffered any personal injury; they claim instead that they would not have purchased Zantac had they known about the alleged NDMA-related risks.  Based on these allegations, the complaints assert a variety of overlapping causes of action, including claims for (1) design defect; (2) failure to warn; (3) breach of express and implied warranty; (4) negligence; (5) fraudulent concealment; and (6) violations of state consumer-protection laws.

## ARGUMENT

### I.     The Related Actions Should Be Centralized in the District of New Jersey.

Given where the cases have been filed, and relevant factors such as convenience to the parties, centralization of these cases in the District of New Jersey is warranted.  Defendants further suggest that Judge Wolfson, who currently presides over all pending cases in that District, is an especially appropriate transferee judge.

### A.      Centralization is Appropriate.

Under 28 U.S.C. § 1407(a), centralization of related actions is appropriate where: (1) the cases involve common questions of fact; (2) consolidation for pretrial proceedings will serve the convenience of the parties and witnesses; and (3) centralization will promote the just and efficient conduct of the litigation.  *In re Anthem, Inc., Customer Data Security Breach Litig.*, 109 F. Supp. 3d 1364, 1365 (U.S. Jud. Pan. Mult. Lit. 2015).  All three considerations weigh in favor of transfer here.

The common factual issue in every plaintiff's complaint is the allegation that use of ranitidine contributes to excessive amounts of NDMA, which plaintiffs allege exposed them to a risk of cancer and in some cases caused them to develop cancer.  *See, e.g.*, Compl. ¶¶ 7-12, *Garza*, No. 5:19-cv-05772 (N.D. Cal.); Compl. ¶¶ 12-15, *Pinales v. Sanofi S.A., et al.*, No. 3:19-cv-19324 (D.N.J.); Compl. ¶¶ 2, 19-22, *McDonald v. Sanofi S.A. et al.*, No. 3:19-cv-04429 (N.D. Fla.).  The fact that these cases "will share factual questions regarding general causation (in particular, the biological mechanism of the alleged injury), the background science, and common regulatory issues" supports the creation of an MDL.  *In re: Fluoroquinolone Prod. Liab. Litig.*, 122 F. Supp. 3d 1378, 1379 (U.S. Jud. Pan. Mult. Lit. 2015).

Centralization would facilitate efficient resolution of this critical issue.  Because plaintiffs each allege that Zantac use causes unsafe levels of NDMA in the body, and that such levels can cause cancer in humans, common questions about whether reliable scientific evidence exists to support those assertions will guide the management of every case.  An MDL court can craft mechanisms to address efficiently questions of general causation, which all plaintiffs must prove

to prevail on their claims.[4]  *See, e.g.*, *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1359 (U.S. Jud. Pan. Mult. Lit. 2017) (noting that where "discovery and pretrial motions concerning the issue of general causation have been, or will be, at the center of all actions," transfer was warranted); *In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*, 176 F. Supp. 3d 1377, 1378 (U.S. Jud. Pan. Mult. Lit. 2016) ("Issues concerning general causation, the background science, regulatory history, and marketing will be common to all actions."); *In re: Roundup Prod. Liab. Litig.*, 3:16-md-02741, Pretrial Order No. 3 (N.D. Cal.) (adopting a scheduling order for the "general-causation phase of this litigation").  It can use similar mechanisms to address other issues that will be relevant across multiple cases, such as whether plaintiffs' claims are preempted by federal law.

Given these common issues and the threatened volume of claims, centralization will serve the convenience of the parties and witnesses, while promoting the just and efficient conduct of the litigation.  In just the two months since Valisure's citizen petition was released, more than three dozen lawsuits have been filed, including over a dozen overlapping and competing putative class actions, as well as claims by third-party payors.  Centralization is therefore appropriate to address all these overlapping claims.  *See, e.g.*, *In re: Zimmer Durom Hip Cup Prod. Liab. Litig.*, 717 F. Supp. 2d 1376, 1378 (U.S. Jud. Pan. Mult. Lit. 2010) (granting transfer where the actions all raised the same "paramount issues concerning design, manufacture, testing, and marketing of a single medical device"); *In re: Yasmin, Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 655 F. Supp. 2d 1343, 1344 (U.S.

---

[4] To the extent that specific causation becomes relevant, a transferee judge can craft appropriate mechanisms to efficiently address those issues as well.  *See, e.g.*, *In re Denture Cream Prod. Liab. Litig.*, 624 F. Supp. 2d 1379, 1381 (U.S. Jud. Pan. Mult. Lit. 2009) (granting transfer and noting that a "transferee court can employ any number of pretrial techniques—such as establishing separate discovery and/or motion tracks—to efficiently manage this litigation.").

Jud. Pan. Mult. Lit. 2009) ("[T]he Panel has frequently combined actions involving claims relating to sales and marketing of medications with actions involving personal injury claims from use of the same pharmaceutical products").  Moreover, the Panel has now heard from a range of lawyers purporting to represent many additional prospective claimants.  *See* Dkt. No. 9 at 4. This volume of existing and potential claims justifies the creation of an MDL.

### B.      The MDL Should be Transferred to the District of New Jersey.

#### 1.      The District of New Jersey is a Convenient Forum.

As the moving plaintiffs explained, centralization in the District of New Jersey makes the most sense.  *See* Dkt. No. 1 at 14-19.  Most of the key evidence and witnesses, including the majority of defendants' knowledgeable current and former employees, will be located in or near New Jersey.  The Sanofi defendants, which are parties in the majority of the actions, currently own the rights to manufacture and distribute over-the-counter Zantac.  Sanofi's headquarters are in New Jersey.  The remaining defendants—which once held the rights to distribute Zantac in the United States—are headquartered close by in Philadelphia (GSK), New York (Pfizer), and Connecticut (BI).

These parties are by far the most likely to have relevant witnesses and evidence applicable to all related cases.  *In re: Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, 780 F. Supp. 2d 1379, 1382 (U.S. Jud. Pan. Mult. Lit. 2011) (granting transfer to the district where the defendant's headquarters were located, as "[r]elevant documents and witnesses" were likely located there); *In re Vytorin/Zetia Mktg., Sales Practices & Prod. Liab. Litig.*, 543 F. Supp. 2d 1378, 1380 (U.S. Jud. Pan. Mult. Lit. 2008) (same).  Especially since *all four* of the main defendants have headquarters located in or near the District of New Jersey, the convenience of the parties and witnesses is plainly served by transferring the cases to that District.

The District of New Jersey would also be the most convenient location for defense counsel, as counsel for all four of the main defendants are based in either New York, Philadelphia, or Washington, and all maintain offices in New York.  Likewise, counsel for many of the plaintiffs, including Seeger Weiss LLP; Hagens Berman Sobol Shapiro LLP; Baum, Hedlund, Aristei, & Goldman, P.C.; Bursor & Fisher, P.A.; and the Ferraro Law Firm, have offices in Philadelphia, Washington, or New York.

Transfer to the District of New Jersey would also be convenient for non-local parties and witnesses.  This District is conveniently located with access to two major airports: Newark Liberty International Airport and Philadelphia International Airport.  The Trenton division— where all cases filed in the District of New Jersey have been assigned—is also accessible via Amtrak.

Overall, both the locations of the parties and the forum's accessibility make the District of New Jersey well suited to be the transferee district for this litigation.  *See In re Johnson & Johnson Talcum Powder*, 220 F. Supp. 3d at 1359 (granting transfer to the District of New Jersey and assigning the cases to Judge Wolfson because the defendant was headquartered in New Jersey, it was located in close proximity to actions pending in other jurisdictions on the East Coast, and the district was "a convenient and accessible forum for this nationwide litigation").

### 2. The Highest Number of Plaintiffs Have Filed in the District of New Jersey.

The District of New Jersey has quickly become the center of gravity of these cases, with that court having the highest number of pending related claims:  five putative class actions, and seven personal injury cases on behalf of twelve claimants.  Although the number of cases filed in a district is not a dispositive factor, it weighs in favor of transfer in conjunction with other considerations.  *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, 560 F. Supp. 2d 1359, 1361 (U.S.

Jud. Pan. Mult. Lit. 2008) (selecting the district where the largest number of cases had been filed); *In re Marine Hose Antitrust Litig.* (No. II), 531 F. Supp. 2d 1381, 1382 (J.P.M.L 2008) (same); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (U.S. Jud. Pan. Mult. Lit. 2002) (same).  In this case, this factor has particular force given that the District of New Jersey also is where the first-filed nationwide putative class action was initiated. *See In re: Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 588 F. Supp. 2d 1374, 1375 (U.S. Jud. Pan. Mult. Lit.. 2008) (transferring cases to a district based in part on the number of actions pending there, "including the first-filed action").

> **3.    All District of New Jersey Cases Have Been Assigned to the Same Judge, and That Judge Should Be Assigned this MDL.**

All of the cases in the District of New Jersey have already been assigned to Judge Wolfson, a highly experienced judge who is eminently qualified to preside over this MDL.  If centralization occurs in the District of New Jersey, there is no reason to reassign these cases to a different judge.

This will not be an ordinary MDL.  It is likely to be more complex than a typical MDL proceeding given the number of defendants that have distributed Zantac over more than 35 years and the questionable scientific basis for plaintiffs' claim that ranitidine might lead to cancer.  A substantial number of cases have already been filed in a short time, and—according to plaintiffs' counsel—the number of lawsuits is only expected to rise substantially.  *See* Dkt. No. 9 at 4.  The nationwide advertising campaign that has been undertaken by plaintiffs' counsel also highlights the need for an experienced MDL jurist to craft methods to weed out baseless claims efficiently and expeditiously.

Judge Wolfson is perfectly suited to handle an MDL of this nature, given her special experience with MDL proceedings that involve product liability claims against pharmaceutical

manufacturers, as well as consumer class actions involving such products.[5]  *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 220 F. Supp. 3d 1356, 1359 (U.S. Jud. Pan. Mult. Lit. 2016) (recognizing Judge Wolfson as an "experienced MDL judge" in this type of litigation); *In re Vonage Mktng. & Sales Pracs.* 505 F. Supp. 2d 1375, 1377 (U.S. Jud. Pan. Mult. Lit. 2007) (characterizing Judge Wolfson as a judge with the "experience to steer this litigation on a prudent course").  In fact, plaintiffs who filed the initial petition to transfer specifically cited her substantial experience handling pharmaceutical MDL cases, Dkt. No. 1 at 18 n.32, and the *Combs* plaintiffs similarly stated that Judge Wolfson "would be an excellent choice to oversee this MDL," Dkt. No. 61 at 3.

Judge Wolfson would also appear to have the capacity to handle a new MDL proceeding. One of her current MDLs is reaching its conclusion.  *In re Plavix Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:13-cv-2418 (D.N.J.).  Furthermore, the demands in another of her MDLs may decrease, as the *Daubert* hearings have been completed.  *In re Johnson & Johnson Talcum Powder Prod. Mktng, Sales Practices and Prod. Liab. Litig.*, 3:16-md-2738 (D.N.J.).

These considerations all weigh heavily in favor of centralizing these cases in the District of New Jersey and appointing Judge Wolfson to oversee them.

## II.     Alternatively, the Southern District of New York Is An Appropriate Venue.

If the Panel decides not to centralize this litigation in the District of New Jersey, it should do so in the nearby Southern District of New York, where three lawsuits are pending.  Like New Jersey, the Southern District of New York is the headquarters of one pharmaceutical defendant

---

[5] *See, e.g.*, *In re Johnson & Johnson Talcum Powder Prod. Mktng, Sales Practices and Prod. Liab. Litig.*, 3:16-md-2738 (D.N.J.); *In re Plavix Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:13-cv-2418 (D.N.J.); *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig. (No. II)*, No. 3:08-cv8-2243 (D.N.J.).

(Pfizer), and also is close to the headquarters of the other pharmaceutical manufacturer defendants, and it is convenient for the parties, witnesses, and counsel in these proceedings.  And like the District of New Jersey, there are many judges in the Southern District of New York with the necessary experience managing pharmaceutical MDLs that will be essential to this case.[6]

III.   **As Compared to the District of New Jersey or the Southern District of New York, the Other Proposed Venues Are Less Convenient or Appropriate.**

A.   **The Southern District of Florida Is Not A More Appropriate Venue.**

The *McDonald*, *Hansen*, and *Kerzer* plaintiffs have asked for centralization in the Southern District of Florida, but they do not present a persuasive case for transfer.  These plaintiffs assert that "more Zantac federal lawsuits are pending in Florida than any other state." Dkt. No. 9 at 5; *see also* Dkt. No. 19 at 17.  Although that may have been true when these plaintiffs filed their response, the number of cases in the District of New Jersey now exceeds the number in the Southern District of Florida.

More importantly, that location is far less convenient than the District of New Jersey.  As noted above, all four main defendants—the pharmaceutical manufacturers—are based in or close to New Jersey.  Of the remaining defendants, only Publix—a supermarket chain named in a single case, and unlikely to play a significant role in this litigation—is headquartered in Florida. Transfer to the Southern District of Florida would require substantial air travel for virtually all the parties and their counsel.

B.   **The District of New Jersey's Camden Division Is Not A More Appropriate Venue.**

As a fallback, the *McDonald* plaintiff admits that the District of New Jersey is "a logical choice as transferee court," Dkt. No. 9 at 5, but suggests these cases should be assigned to that

---

[6] For instance, Judge Paul Engelmayer, Judge Louis Kaplan, and Judge Cathy Seibel all have such experience.

District's Camden Division.  The *McDonald* plaintiff makes this request even though there is not a single lawsuit pending in that division.

The *McDonald* plaintiff is wrong to assert that this case is so similar to the *Valsartan* MDL that it should be assigned to the same judge.  Even the *Hansen* and *White* plaintiffs disagree, based on the allegation that all plaintiffs make that the inherent structure of Zantac leads to NDMA, and not a manufacturing issue.[7]  *See Hansen* Plaintiffs' Response, Dkt. No. 19 at 8 ("This case is not about contamination—it is not like the Valsartan NDMA contamination case."); *id.* at 15 n.18 ("This case is different than *Valsartan*"); *White* Plaintiffs' Response, Dkt. No. 57 at 7 ("[T]he differences between the two actions suggest that instead of being consolidated in the same court, the Zantac litigation should be given individualized attention before a different court.").

Of the common factual questions that this Panel identified in *Valsartan*, only one has potential overlap with the present cases:  "whether the amounts of NDMA and NDEA in the medications presented a risk of cancer or other injuries."[8]  *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.*, 363 F. Supp. 3d 1378, 1381

---

[7] To be sure, both cases involve allegations that the medications at issue—Valsartan in that case, and Zantac in this case—contribute to excessive levels of NDMA.  But the similarities end there. Plaintiffs in these cases have alleged that the risks of NDMA are inherent to ranitidine products, regardless of how the products are manufactured.  *See, e.g.*, Compl. ¶ 59, *Garza*, No. 5:19-cv-05772 (N.D. Cal.) ("the high levels of NDMA produced by Zantac are not caused by a manufacturing defect but rather are inherent to the molecular structure or ranitidine").  The *Valsartan* litigation, by contrast, is premised on claims that the plaintiffs were exposed to NDMA as a result of impurities in the medication potentially introduced during the manufacturing process.  *In re Valsartan*, 363 F. Supp. 3d at 1380-81.

[8] The other common questions of fact recognized by this Panel were: "(1) whether the generic valsartan sold by defendants contained NDMA or NDEA; (2) the cause of the alleged impurities, including alleged defects in the manufacturing and sampling process; (3) when defendants knew or should have known of the impurities;" and "(4) how long the NDMA- and NDEA-containing valsartan medications were in circulation."  *In re Valsartan*, 363 F. Supp. 3d at 1381.  All of these issues are specific to the *Valsartan* litigation, and familiarity with them will be of no benefit in these cases.

(U.S. Jud. Pan. Mult. Lit. 2019).  But this issue is not one that is so specialized or unique that the *Valsartan* MDL judge is especially equipped to consider it.  And even that inquiry will vary here, depending on the amounts of NDMA (if any) found in the products in these cases compared to the *Valsartan* products.  The cases will also involve different factual inquiries as to whether each form and version of ranitidine contributes to excessive levels of NDMA and whether any particular defendant had knowledge of any risks between any particular medication and NDMA.

### C.  Neither the Eastern District of Tennessee Nor the Middle District of Tennessee Is A More Appropriate Venue.

The *Anthony* plaintiff has suggested that the Eastern District of Tennessee or the Middle District of Tennessee would be a more appropriate venue.  Dkt. No. 55 at 4-6.  But not even the *Anthony* plaintiff filed suit in Tennessee; she instead filed suit in the Western District of North Carolina.  In fact, not a single one of the cases filed to date has been filed in Tennessee.

Tennessee is therefore not convenient for any party or their counsel.  Although one of the Sanofi defendants (Chattem, Inc.) is located in Tennessee, the other U.S. Sanofi defendants are in New Jersey, where the United States Sanofi headquarters are located.  Other than Chattem, Tennessee is farther away from all the defendants than New Jersey is.  Unlike the District of New Jersey, Tennessee is not within driving and Amtrak distance of any of the main defendants' headquarters.

### D.  The Northern District of Illinois Is Not a More Appropriate Venue.

The *White* plaintiffs have argued that the Northern District of Illinois would be best suited to handle this litigation expeditiously, but they are mistaken.  Dkt. No. 57 at 3-4.  *None* of the defendants in any of the related actions are located in Illinois, and none of the main defendants' counsel are headquartered in or near Illinois.  Litigating in Illinois would thus require substantial travel for all of the defendants, key witnesses, and defendants' counsel.

Furthermore, the *White* plaintiffs are the *only* plaintiffs to file suit in the Northern District of Illinois; no other case is pending in that venue. Even if the plaintiffs were accurate in their characterization of the district's caseload, favorable docket conditions are simply insufficient to overcome the immense inconvenience that litigating in the Northern District of Illinois would involve.

### E. The Northern District of California Is Not A More Appropriate Venue.

The *Hansen* plaintiffs ask for transfer to the Northern District of California. *See Hansen* Response, Dkt. No. 19 at 14. Transferring these cases to California would be even more inconvenient for the parties and counsel than transfer to any other proposed district. All of the defendants are based on the East Coast, as are their counsel. Cross-country travel would be required for virtually all of the lawyers and many witnesses in the litigation.

The *Hansen* plaintiffs argue that California is the most appropriate venue in part because California is unique in that it recognizes a "negligence claim against the original brand name maker for injuries caused by a generic drug." Dkt. No. 19 at 16 (citing *T.H. v. Novartis Pharm. Corp.*, 407 P.3d 18, 29 (Cal. 2017)). Thus, these plaintiffs speculate, "the largest numbers of plaintiffs will come from California," and it "only makes good sense" to have a California district court apply this law. *Id.*

The Panel's centralization decision should not be driven by any individual state's law, especially when it is likely that the vast majority of plaintiffs will come from the other 49 states and thus not be impacted by California law.[9] *Cf. White* Plaintiffs' Response, Dkt. No. 57 at 8

---

[9] It also bears noting that there are presently no personal-injury plaintiffs claiming generic drug use to whom this California legal doctrine might apply. There is a single generic user making class action allegations in California, but the legal doctrine of innovator liability is not relevant to those class action claims. Thus, while there may be such personal-injury plaintiffs in the future, that possibility remains uncertain now, just as it remains uncertain whether such plaintiffs will

("choice of law questions and application of state substantive law should not be a factor in this panel's decision").  Indeed, the *Hansen* plaintiffs' contention that it "only makes good sense" to have a California district court apply California state law ignores the general presumption that federal judges are equally capable of applying state law, and a judge in New Jersey is perfectly able to determine the applicable law for California resident plaintiffs transferred to the MDL. Indeed, MDL judges do this all the time, precisely because they have cases transferred to them in which many different states' laws govern.

## CONCLUSION

For these reasons, all the related actions should be centralized for pretrial proceedings in the District of New Jersey and assigned to Judge Wolfson.

November 27, 2019

Respectfully submitted,

_/S/ Paul Schmidt_____
Paul Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1120
Fax: (646) 441-9171
pschmidt@cov.com

*Attorney for Defendant Boehringer*
*Ingelheim Pharmaceuticals, Inc.*

---

predominantly come from California.  Picking a less convenient location based on a guess that the future plaintiff pool will be very different from the current plaintiff pool is not a sensible approach.

_/S/ Anand Agneshwar (w/permission)_____
Anand Agneshwar
ARNOLD & PORTER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8011
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Attorney for Defendant Sanofi-Aventis U.S.*
*LLC, Sanofi US Services Inc., and Chattem,*
*Inc.*

_/S/ Mark Cheffo (w/permission)_____
Mark Cheffo
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 689-3500
Fax: (212) 689-3590
mark.cheffo@dechert.com

*Attorney for Defendants GlaxoSmithKline*
*LLC*

_/S/ Joseph G. Petrosinelli (w/permission)___
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
Jpetrosinelli@wc.com

*Attorney for Defendant Pfizer Inc.*