**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL No. 2924 |

<u>**INTERESTED PARTY RESPONSE**</u>
<u>**IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C.**</u>
<u>**§ 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**</u>

Plaintiffs, Howell Franklin (C.D. Cal.), Gary Campu (E.D. Cal.), Gary Hart (S.D. Cal.), and Ivan Safra (S.D. Fla.) (collectively, the "Plaintiffs"), submit the following Interested Party Response pursuant to JPML Rule 6.2(e).

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................ 2

INTRODUCTION ................................................................................................................... 3

FACTUAL BACKGROUND .................................................................................................. 3

    I.      FDA Approval of Zantac ........................................................................................... 3

    II.     The Dangers of NDMA ............................................................................................ 4

           A.      Molecular Structure of Zantac & Formation of NDMA ............................ 5

           B.      Recent Ranitidine Studies ........................................................................... 6

DISCUSSION ......................................................................................................................... 7

    I.      Transfer is Proper Pursuant to 28 U.S.C. § 1407 .................................................... 7

    II.     Centralization in the Southern District of Florida is the Most Convenient for the
           Parties. .................................................................................................................... 7

    A.     The Southern District of Florida Is The Most Convenient District For Transfer
          Given That The Majority Of Cases Are Currently Pending There. ......................... 7

    B.     Alternatively, The Northern District Of California Is Appropriate For Transfer. .... 8

CONCLUSION ....................................................................................................................... 8

## INTRODUCTION

Plaintiffs support centralization and respectfully requests that the Panel consider centralizing the cases in the Southern District of Florida, where a large number, more than half, of all personal injury cases are pending  (to date) and the Court has significant capacity to take on this massive litigation. Alternatively, Plaintiffs propose the Northern District of California because of the large number of cases already filed there, and because of the prevalence of generic use.

## FACTUAL BACKGROUND

### I.      FDA Approval of Zantac

Zantac (ranitidine) belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat various gastric conditions.  Ranitidine was developed by a GlaxoSmithKline ("GSK") subsidiary in 1976 and the Food and Drug Administration ("FDA") approved GSK's New Drug Application ("NDA") for prescription use as Zantac in 1983.  Zantac was the first prescription drug to reach $1 billion in sales and did so by December 1986.

An over-the-counter ("OTC") version of Zantac was developed by GSK's predecessor, Glaxo Wellcome, and Pfizer's predecessor, Warner-Lambert, which was approved in 1995. Two years later, generic ranitidine entered the market. In 1998, the joint venture between Glaxo Welcome and Warner-Lambert ended with GSK retaining the rights to sell all forms of Zantac internationally and prescription Zantac domestically. Pfizer retained ownership and control over the Zantac trademark and the rights to OTC Zantac domestically. In 2006, Pfizer sold the rights to sell and market OTC Zantac to Boehringer Ingelheim Pharmaceuticals, Inc. ("BIP").  Thereafter, in 2017, BIP sold the rights of OTC Zantac to Sanofi US Services Inc. ("Sanofi"). GSK's brand name Zantac continued to be sold in the United States through 2009. Sanofi currently owns OTC

Zantac and recently recalled all OTC Zantac.

On October 2, 2019, the FDA ordered testing on Zantac and outlined specific protocols to use, noting unacceptable levels of NDMA in samples of ranitidine.[1]  Thereafter, on November 1, 2019, the FDA released its preliminary results, which revealed unsafe levels of NDMA in various ranitidine products, including the brand name products controlled by Sanofi.[2]

## II.    The Dangers of NDMA

NDMA is a member of the class of chemicals known as N-nitrosamines, and it can form in both industrial and as a result of natural processes. NDMA is a long-recognized potent carcinogen. The World Health Organization ("WHO") states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[3] Likewise, the Environmental Protection Agency ("EPA"), the International Agency for Research on Cancer ("IARC"), and the FDA consider NDMA a probable human carcinogen and acknowledge it is a chemical that "could cause cancer." [4] NDMA is no longer produced or commercially used in the United States, except for research.

Animal studies in mice and rats utilizing various methods of exposures (including, for example, inhalation, injection, and intraperitoneal (abdomen injection)), revealed cancer in the lung, liver, kidney, nasal cavity, and stomach. Other animal studies have revealed cancer in the kidneys, bladder, liver, lung, and pancreas when NDMA was ingested orally. Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested.

---

[1] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine
[2] *See* https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine (accessed November 7, 2019) (noting that any level above .096 micrograms—or 96 nanograms—is above the safe limit, and listing elevated levels for Sanofi Pharmaceutical OTC and Rx Ranitidine 150mg, Cardinal Health OTC Ranitidine 150mg, Sandoz Rx Rantidine 300 mg, Aurobindo Rx Ranitidine 300mg).
[3] https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf
[4] https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine

Epidemiological studies in humans reveal that oral ingestion of NDMA, with levels of exposure up to 112 nanograms per day reveal increased association of stomach, digestive tract, lung, gastric system, prostate, brain, colorectal, mouth, and esophageal cancer.

The FDA established a permissible intake level of NDMA of 96 nongrams (ng), and yet, the levels observed in recent testing show NDMA levels in excess of 3,000,000 ng.[5] One filtered cigarette contains between 5 to 43 ng of NDMA.

A.    **Molecular Structure of Zantac & Formation of NDMA**

The ranitidine molecule contains both a nitrite and DMA group, which are well known to combine to form NDMA. Simply put, ranitidine produces NDMA by reacting with itself, meaning every dosage and form exposes users to NDMA. When exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing foods), the Nitroso molecule (0=N) and the DMA molecule ($H_3C$-N-$CH_3$) break off and reform as NDMA.

Valisure, LLC, an online pharmacy and analytical laboratory accredited by the International Organization for Standardization ("ISO"), began testing batches of Zantac it was dispensing. Valisure's testing revealed shockingly high levels of NDMA, as much as more than 2 million ng per 150 mg Zantac tablet. Valisure performed more testing, specifically in conditions simulating the human stomach, and again, the results revealed significant NDMA formation, particularly with nitrite present. Notably, Zantac was advertised to be used when consuming foods with high levels of nitrites, like tacos or pizza, etc.[6]  Valisure published its results in the form of a citizen's petition to the FDA seeking the immediate recall of all ranitidine products.

---

[5] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine
[6] https://www.ispot.tv/ad/dY7n/zantac-family-taco-night

B.    **Recent Ranitidine Studies**

The Stanford Study in 2016 measured NDMA in the urine of healthy individuals over the course of 24 hours, followed by administration of one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for 24 hours. On average, the level of NDMA in the urine increased by 400 times after one dose of ranitidine, reaching approximately 47,000 ng. Scientists explained, however, that because humans do not typically excrete NDMA in their urine, the 47,000 nanograms likely only captures $1/100^{th}$ of the actual NDMA levels in the human body. Indeed, because ranitidine rapidly distributes throughout the body following ingestion, it is likely that NDMA forms in organs throughout the human body in addition to the NDMA formed in the human stomach.

On November 1, 2019, the FDA released the results of laboratory experiments on various ranitidine products using human gastric fluid. The results showed unacceptable levels of NDMA, including in the brand name products manufactured by Sanofi. The levels observed by the FDA's testing were not as elevated as the levels seen in the Stanford Study and Valisure testing; but notably, the FDA's analysis did not use any nitrites, so the levels of NDMA observed are comparable with the Valisure testing.  The FDA's testing also did not examine how ranitidine interacted with other organs or DDAH-1.  Nonetheless, the FDA ordered manufacturers to test their ranitidine products, and advised companies to recall ranitidine if testing shows levels of NDMA above the 96 ng per day limit. The FDA further advised consumers taking OTC ranitidine to consider using other OTC products approved for their conditions, such as Pepcid and Tagamet.[7]

---

[7] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine#5ddb815c5389f

## DISCUSSION

### I.     Transfer is Proper Pursuant to 28 U.S.C. § 1407

Transfer is appropriate where civil actions involving one or more common questions of fact are pending in different districts, and such transfers shall be made for the convenience of parties and witnesses and when transfer will promote the just and efficient conduct of such actions. 28 U.S.C. § 1407(a).  Centralization is appropriate here, particularly given the length of time Zantac has been on the market and the large size of this litigation.  It is likely that millions of people have ingested Zantac since it first came on the market in 1983.  Filed cases involve common issues of fact and law related to whether NDMA causes cancer.  Centralization will benefit the parties here, will significantly reduce costs to all parties and the judiciary, and likewise prevent duplication of depositions and discovery. It appears all parties favor centralization; the issue is where.

### II.     Centralization in the Southern District of Florida is the Most Convenient for the Parties.

The selection of an appropriate transferee court is based on a balancing test of several factors, no one of which is dispositive.  See Manual for Complex Litigation (Fourth) § 20.131 (2004) (citing Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation,* 72 F.R.D. 211, 214-15 (1977)).  These factors include "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."  Id.

#### A.  The Southern District of Florida Is The Most Convenient District For Transfer Given That The Majority Of Cases Are Currently Pending There.

Plaintiffs support centralization in the Southern District of Florida.  The first personal

injury (*Galimidi*) case was filed there, and currently the more than half of the personal injury cases on file are pending there.  Plaintiff supports the Hon. Robert N. Scola Jr., who is presiding over one of the personal injury cases filed there, to oversee this important litigation. The case in front of Judge Scola has been pending since October 3, 2019; an Order setting forth discovery procedures is in place and Defendants' motion to dismiss has been briefed. Again, given that the most actions are pending there, transfer to the Southern District of Florida would promote just and efficient conduct of litigation. See *In re Nig. Charter Flights Contract Litig.*, 323 F. Supp. 2d 1375 (J.P.M.L. 2004).

**B.  Alternatively, The Northern District Of California Is Appropriate For Transfer.**

The California Supreme Court recognizes a negligence claim against brand manufacturers for injuries caused by generic drugs. See T.H. v. Novartis Pharm. Corp., 407 P.3d 18, 29 (Cal. 2017). Because Zantac has been generic since 1997, and because other states follow PLIVA, Inc. v. Mensing,[8] presumably, the largest number of plaintiffs will come from California, and this central issue to the litigation will involve application of California law. See *In re Continental Grain Co.*, 482 F. Supp. 330 (J.P.M.L. 1979). Having a California district court interpret California law makes good sense.  Further, there are seven cases filed in California federal courts. The *first* class action case (*Garza*) is pending in the Northern District of California before the Hon. Beth L. Freeman. Accordingly, Plaintiff supports Judge Freeman presiding over the Zantac MDL should the Panel transfer these cases.

**CONCLUSION**

Plaintiffs support the Motion to Transfer these similar actions to the Southern District of Florida, or alternatively, to the Northern District of California.

---

[8] 564 U.S. 604 (2011).

Dated: January 9, 2020

Respectfully submitted,

*/s/ Jennifer A. Moore*
Jennifer A. Moore
MOORE LAW GROUP, PLLC
1473 South 4th Street
Louisville, KY 40208
T: (502) 717-4080
F: (502) 717-4086
jennifer@moorelawgroup.com

*Counsel for Interested Parties, Howell Franklin, Gary Campu, Gary Hart, and Ivan Safra*

**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL No. 2924 |

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that copies of the foregoing Statement of Interest and Proof of Service were served on all interested parties electronically via the Panel's CM/ECF system on January 6, 2020.

*/s/ Jennifer A. Moore*
Jennifer A. Moore
MOORE LAW GROUP, PLLC
1473 South 4th Street
Louisville, KY 40208
T: (502) 717-4080
F: (502) 717-4086
jennifer@moorelawgroup.com

*Counsel for Interested Parties, Howell Franklin, Gary Campu, Gary Hart, and Ivan Safra*