BEFORE THE UNITED STATES JUDICIAL
PANEL ON MULTIDISTRICT LITIGATION

IN RE: ZANTAC (RANITIDINE)                    MDL No. 2924
PRODUCTS LIABILITY
LITIGATION

_____/

**THIS DOCUMENT RELATES TO:**

*U.S. ex rel. Valisure LLC et al. v. GlaxoSmithKline LLC, et al.*,
Case No. 2:19-cv-04239 (E.D. Pa.)

### INTERESTED PARTY VALISURE'S RESPONSE TO DEFENDANT GLAXOSMITHKLINE'S MOTION TO TRANSFER

### INTRODUCTION

On September 13, 2019, Relator Valisure LLC ("Valisure") filed a *qui tam* lawsuit in the Eastern District of Pennsylvania against GlaxoSmithKline, plc, and GlaxoSmithKline, LLC (collectively "GSK"), alleging that GSK violated the federal False Claims Act and various state false claim acts by causing the submission of false claims for ranitidine to be paid by government payors. At the core of this case is the allegation that ranitidine forms into an unintended degradant, N-Nitrosodimethylamine ("NDMA"), rendering each ranitidine product adulterated, misbranded, and unfit for human consumption; in other words, ranitidine should never have been sold to government payors in the first place. Five years after filing, GSK seeks to have the case transferred to MDL No. 2924, *In re Zantac (Ranitidine) Products Liability Litigation* ("Zantac MDL") pursuant to 28 U.S.C. § 1407(a). Valisure opposes for three key reasons.

*First*, Section 1407 transfer is supposed to focus on common *pretrial* issues for multiple cases. 28 U.S.C. § 1407(a); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 28 (1998). But, considering the status of the MDL—where all discovery is completed, all pretrial matters adjudicated, and all future cases are immediately closed—there are no remaining

1

common pretrial issues left to coordinate between this case and the MDL. To be sure, this case involves ranitidine and its ability to form NDMA. But that is, essentially, where the similarities between this case and the MDL end.[1] This case does *not* allege that NDMA in ranitidine causes cancer (which has been the primary focus of the MDL), nor does it assert claims for personal injury or economic injury under various state tort and consumer protection laws. This case involves esoteric legal issues related to false claims—issues and pretrial matters that have no bearing on any other case in the MDL.

Transferring a case under Section 1407 is not appropriate when the MDL has already accomplished the primary objectives of centralization and the remaining issues are not common. *See In re: Cessna 208 Series Aircraft Prod. Liab. Litig.*, 655 F. Supp. 2d 1379, 1380 (J.P.M.L. 2009). Panel precedent confirms that when an MDL is at a late stage and where common fact issues are limited, transfer is unnecessary or even appropriate. *See*, *e.g.*, *In re: Gaiam, Inc., Water Bottle Mktg., Sales Pracs. & Prod. Liab. Litig.*, 672 F. Supp. 2d 1373, 1375 (J.P.M.L. 2010) (denying motion to transfer pursuant to Section 1407 where the MDL was "advanced" and the "new cases would not fit easily within it[,]" notwithstanding the fact that "all actions concern products that are alleged to contain BPA"). Sending this case to the MDL would not facilitate *pretrial* coordination; it would simply result in a different court presiding over new claims and new issues that have never been before it while, at the same time, depriving Valisure of its chosen forum and counsel.

*Second*, transfer of Valisure's False Claims Act ("FCA") case, which has been investigated and pending in the Eastern District of Pennsylvania for almost five years, would inconvenience

---

[1] Importantly, this single overlapping issue of whether ranitidine degrades into NDMA is not disputed, as evidenced by GSK's own publications and the U.S. Food and Drug Administration's ("FDA") recall of all ranitidine products due to its ability to form NDMA. There is nothing to litigate on this point as GSK has admitted this fact.

the parties and witnesses. This is especially true given the unique nature of FCA litigation, where the local Philadelphia office of the Department of Justice maintains a keen interest in overseeing the progress of the case and continuing to coordinate with various attorney generals of the state governments. Moreover, given that GSK has corporate offices in Pennsylvania and its counsel, Dechert LLP, is headquartered in Philadelphia, the Eastern District of Pennsylvania is a convenient location for all parties and witnesses.

*Third*, transfer of this case to the Zantac MDL would not promote justice. The Zantac MDL has issued orders making adverse factual findings about Valisure and made statements about Valisure's motives in filing the citizen's petition with the FDA and the scientific data it generated in 2019. Given these public statements, it raises concerns about impartiality. The Zantac MDL made its findings without the benefit of hearing from Valisure, as Valisure was a third party in those MDL orders. It would cut against the grain of preserving the appearance of impartiality to force Valisure to litigate in a court that has, publicly, judged it. Keeping Valisure's case in the Eastern District of Pennsylvania will avoid those concerns.

Overall, this case is truly unique to the MDL, and considering the MDL's advanced stage, it is imprudent to transfer this case there. The very considerations that constrain Section 1407(a) transfers militate in favor of denying GSK's motion. As such, Valisure respectfully requests that this Court deny GSK's motion.

## BACKGROUND

I.  **The Claims Alleged in the First Amended Complaint**

Ranitidine, as a molecule, contains a nitrogen atom directly bonded to three carbon atoms, also known as a tertiary amine. First Amend. Complaint ("FAC") at ¶¶ 75, 86–87. Since the 1970s, multiple drugs containing tertiary amines have been pulled off the market due to concerns about this chemical structure being susceptible to a chemical reaction called nitrosation,

3

which leads to the formation of chemicals known as nitrosamines. *Id.* at ¶¶ 86–88. Of these nitrosamines, the most well-known and studied one is N-Nitrosodimethylamine ("NDMA"). *Id.* at ¶¶ 53–56. NDMA provides no therapeutic value to humans, has been shown to cause cancer in every species ever studied, and has been highly restricted as a putrid contaminant in drugs and food in the late 1970s. *Id.* at ¶¶ 56–73.

In 1980, GSK sought to enter the antiacid business, having seen the unprecedented success of the H2 blocker cimetidine (Tagamet), sold by SmithKline French, in the United States and United Kingdom. *Id.* at ¶¶ 35–40. Cimetidine works by physically blocking the histamine receptor in the stomach that triggers acid secretion. *Id.* GSK invented a "me too" molecule, ranitidine, which contained a similar physical structure to cimetidine and, thus, would also block the H2 receptor and suppress acid secretion. *Id.*

Shortly after beginning the FDA development process for ranitidine, on May 2, 1980, the U.S. Food and Drug Administration ("FDA") recognized the tertiary amine issue and "voiced their concern about the nitrosation potential of ranitidine." *Id.* at ¶¶ 89–90. GSK, despite its best efforts, was unable to allay the FDA's concerns, so the FDA "urged that a comprehensive description be sent to the FDA describing the exact details and conditions under which the experiments were carried out and this would be a factual report without editorialization." *Id.* at ¶ 90. The FDA's concerns were echoed by pharmaceutical insiders, who also raised concerns about ranitidine nitrosating to form nitrosamines and how, if true, might ruin the then-fledgling GSK. *Id.* at ¶¶ 91–93.

A few months later, GSK conducted a standard test on ranitidine, called the Nitrosation Assay Procedure ("NAP"), which combined ranitidine with sodium nitrite in an acidic environment. *Id.* at ¶¶ 97–99, 115. The NAP experiment showed that ranitidine formed large quantities of NDMA. *Id.* GSK, however, despite being asked to provide all their data, violated

federal law and concealed the study from the FDA. *Id.* at ¶¶ 116–120. We know this concealment was intentional because at that same time, independent researchers raised concern about the ability of ranitidine to nitrosate with nitrite and form a potent genotoxic substance. *Id.* at ¶¶ 100–110. However, instead of disclosing the NDMA data related to ranitidine, which would explain why scientists observed nitrosated ranitidine behaving just like NDMA, GSK published a different study stating that the genotoxic effect of ranitidine was due to a different, non-concerning n-nitroso-derivative and, thus, was safe to humans. *Id.* at ¶¶ 100–115. GSK knew that NDMA could form under those the very conditions identified by independent scientists, and deliberately published data pointing the finger away from NDMA. And the deception worked. The independent investigators were misled that the genotoxic effects observed in nitrosated ranitidine was not caused by NDMA. *Id.* at ¶¶ 132–136.

The FDA was similarly deceived. *Id.* at ¶¶ 121–122. In 1983, the FDA approved ranitidine, and although it expressed lingering concerns that ranitidine was a tertiary amine, the FDA cited the misleading GSK study as evidence of safety. *Id.* And, for the next four decades, GSK continued to conceal and mislead the FDA about the potential of ranitidine to form NDMA, despite possessing a multitude of publications which directly implicated NDMA formation from ranitidine and repeatedly conducting internal studies showing that ranitidine was degrading into a yellow oily substance, i.e., NDMA. *Id.* at ¶¶ 168–189.

In early 2019, an infant daughter of one of the founders of Valisure, the relator, was prescribed ranitidine. Id. at ¶ 191. In a Valisure safety laboratory, the founder tested ranitidine for NDMA using the method that was, at that time, recommended for testing pharmaceutical products. *Id.* at ¶¶ 190–191. The test uncovered large quantities of NDMA. *Id.* at ¶¶ 192–200. Immediately, Valisure recognized that these high levels of NDMA may have been caused by the heat used in the testing method, so they developed, at their own expense, an alternative method

that did not use heat. *Id.* at ¶¶ 196–197. Valisure then conducted a NAP test on ranitidine—the same test that GSK had done in 1981. *Id.* at ¶ 198. And, like GSK, Valisure observed that ranitidine would form NDMA. *Id.* Valisure's findings were almost identical to those observed by GSK in 1981.

However, unlike GSK who concealed the NAP study from the FDA, Valisure disclosed all its data to FDA, both privately in mid-2019 and publicly in a citizen's petition filed in September 2019. *Id.* at ¶¶ 201–206. These results prompted the FDA to investigate the ranitidine-NDMA connection—which, until Valisure shared its data, had never been provided to the FDA by GSK. *Id.* at ¶¶ 210–212, 215–216. Within months, the FDA pulled all ranitidine products off the market and granted Valisure's citizen's petition. *Id.* at ¶¶ 215–216. The FDA explained that "FDA testing and evaluation *prompted by information from third-party laboratories* confirmed that NDMA levels increase in ranitidine even under normal storage conditions, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers." *Id.* at ¶ 215 (emphasis added). It only took a few months for the FDA to pull a drug off the market after seeing the results of Valisure's experiments—the *same* experiments GSK conducted in 1981 and concealed from the FDA. Since being removed, in 2020, no ranitidine product has been permitted to be sold in the U.S. Ranitidine was never safe or fit for human consumption and never should have been sold within the United States.

## II.   The *Qui Tam* Lawsuit

Valisure first filed its *qui tam* lawsuit against GSK in the Eastern District of Pennsylvania on September 13, 2019. The First Amended Complaint alleges that GSK committed fraud, causing false Zantac claims to be paid with taxpayer money by the federal and state governments. FAC at ¶¶ 1–8. Almost five years later, on March 11, 2024, the U.S. government

filed a Notice of Election to Decline Intervention in the case. On March 13, 2024, the Complaint was ordered unsealed. Shortly after, undersigned counsel took over the case and Valisure filed the FAC.

The FAC contains 33 counts: Counts I–III concern violations of the Federal False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)–(C), and the remaining thirty counts concern violations of various state false claims statutes. The FAC alleges that "[e]very time a government-funded program paid a claim for a ranitidine product, the claim was false; whether that product was brand name or generic." *Id.* ¶ 8. In doing so, it invokes theories of factual and legal falsity. *See*, *e.g.*, FAC ¶¶ 9–10. The FAC is clear about its limited scope; "This case is not about whether the NDMA in ranitidine causes cancer." *Id.* ¶ 14. Rather, this lawsuit "is about GSK's fraud on the federal and state governments and the money spent on ranitidine products by governments because of that fraud." *Id*.

### III.  The Zantac MDL's History

On February 6, 2020, this Panel established the Zantac MDL before Judge Robin L. Rosenberg in the Southern District of Florida. *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368 (J.P.M.L. 2020). Since then, the MDL has systematically dismissed nearly every case pending before it based on summary judgment. This includes nearly all personal injury claims, all future personal injury claims, and all economic injury claims. Discovery is completed in the MDL, some of which concerned Valisure because defendants in the MDL served third-party subpoenas on Valisure. At this point, when personal injury cases are transferred into the MDL, they are administratively closed and immediately issued an order to show cause.

### IV.  The Instant Motion

On May 28, 2024, GSK filed a notice of potential tag-along with the JPML, seeking

transfer of Valisure's *qui tam* action to the MDL.  *See* Notice of Potential Tag-Along, Zantac MDL (J.P.M.L. May 28, 2024), ECF No. 1443.  On June 4, 2024, the Clerk of the Panel "determined the listed action[] is not appropriate for inclusion in this MDL.  *See* Rule 7.1(b)(i)." Notice to Counsel (Text Only Entry), Zantac MDL (J.P.M.L. June 4, 2024), ECF No. 1448.  On June 28, 2024, GSK filed the instant motion to transfer.  Valisure now opposes GSK's motion.

## ARGUMENT

I. **Transfer is Not Appropriate When the MDL Already Accomplished the Primary Objectives of Centralization under 28 U.S.C. § 1407 and the Remaining Issues Are Not Common**

Transfer of this case to the MDL would not effectuate the purposes of Section 1407, i.e., to facilitate and streamline *pretrial* proceedings.  28 U.S.C. § 1407(a); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 28 (1998).  Considering the esoteric nature of this case (i.e., claims under the FCA, the maturity of the MDL, and that the fact that the overlapping factual issues between this case and the MDL are resolved) transfer would not facilitate the mandate and purpose of Section 1407. Namely, transfer would be antithetical to both the convenience of the parties and witnesses and efficient justice.

At the beginning of a case, conducting pretrial proceedings – like discovery, pretrial motions, and coordination – before a single court can vastly increase judicial efficiency and the convenience of the parties and witnesses.  It can also facilitate resolution, either through settlement or through broad-stroke dismissals (like the Zantac MDL here).  This efficiency, however, comes with costs.  It necessarily deprives certain plaintiffs of their choice of forum for pretrial matters—often the most important strategic decision made by a plaintiff's attorney.  It also, frequently, deprives certain plaintiffs of the right to have their case litigated by their attorney or pursue case-specific theories of liability and causation.  This is a necessary consequence of coordination, but one that is often warranted when thousands of similar cases are

8

at issue early in a litigation.

Section 1407, and this Panel, are no strangers to these complexities. It is why there are several important guardrails in place that, when faithfully applied, limit the inherent prejudice that can, for some, inure from a Section 1407 transfer. Those guardrails include limiting coordination to *pretrial* matters and ensuring that transfer must "be for the convenience of parties and witnesses and [] promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Although common issues are necessary for pretrial Section 1407 transfer, they are not sufficient. *Id.* Thus, when contemplating the propriety of transferring an action into an existing MDL, the panel considers transfer within the context of the MDL's maturity. *See, e.g.*, *In re: Cessna 208 Series Aircraft Prod. Liab. Litig.*, 655 F. Supp. 2d 1379, 1380 (J.P.M.L. 2009). Important factors include whether discovery has concluded and whether the MDL has issued "substantive rulings that will help shape the litigation of individual cases which remain[.]" *Id.* Thus, this Panel explains:

> When a transferee judge has accomplished essentially all of the primary objectives of centralization under 28 U.S.C. § 1407 and the advantages of transferring a particular tag-along no longer clearly outweigh the disadvantages, then this Panel promotes the interests of efficiency and justice by ending the automatic transfer of such cases.

*Id.* at 1381; *see also In re Motion Picture Licensing Antitrust Litig.*, 479 F. Supp. 581, 590 (J.P.M.L. 1979) ("The purposes of Section 1407 would clearly not be accomplished by transferring actions which are nearly resolved, or by requiring parties who have no interest in the consolidated pretrial proceedings to reap only delay and other inconvenience as a result of transfer."). This issue is particularly acute when the case subject to transfer raises "individual, rather than common" issues. *In re Motion Picture*, 479 F. Supp. at 591. When a case tagged for transfer would bring previously unraised claims, theories, or factual issues into a mature MDL, the equitable concerns governing transfer can, and sometimes should, limit Section 1407

9

transfer. *Id.*

Here, there is no question that the Zantac MDL is mature. The MDL has dismissed nearly every case pending before it based on summary judgment. This includes almost all personal injury claims, all future personal injury claims, and all economic injury claims. Discovery is completed in the MDL. Hundreds of orders have been issued. At this point, when personal injury cases are transferred into the MDL, they are administratively closed and immediately issued an order to show cause. The Zantac MDL is, effectively, finished—with Judge Rosenberg proceeding to remand to state court or dismiss personal injury cases that get drawn into the proceeding. At this late stage in the lifecycle of the MDL, transfer of a unique case, like this one, is inappropriate. *See In re: Cessna*, 655 F. Supp. 2d at 1381*; In re: Gaiam, Inc., Water Bottle Mktg., Sales Pracs. & Prod. Liab. Litig.*, 672 F. Supp. 2d 1373, 1375 (J.P.M.L. 2010) (denying motion to transfer pursuant to Section 1407 where the MDL was "advanced" and the "new cases would not fit easily within it[,]" notwithstanding the fact that "all actions concern products that are alleged to contain BPA"); *In re Bridgestone/Firestone, Inc., Tires Prod. Liab. Litig.*, 659 F. Supp. 2d 1371, 1372 (J.P.M.L. 2009) (vacating conditional transfer order where the MDL had "reached an advanced stage" in that "[a]ll common discovery was completed"); *In re: Checking Acct. Overdraft Litig.*, 818 F. Supp. 2d 1373, (Mem)–1374 (J.P.M.L. 2011) (vacating conditional transfer orders where judge in "quite mature" MDL had already "issued multiple substantive and thoughtful rulings on a variety of pretrial matters, including rulings on motions to dismiss, to compel arbitration, and for class certification"); *In re A. H. Robins Co., Inc.*, 505 F. Supp. 221, 223 (J.P.M.L. 1981) (vacating conditional transfer orders where "litigation has been pending for over five years and discovery of common issues has been completed in the transferee district," notwithstanding that the "actions share questions of fact with actions previously transferred in this litigation[.]").

This does not mean that all future *personal injury* cases should not be transferred into the MDL, or that *all* future cases should be categorically stopped from transfer. Rather, it means effectuating the mandates of Section 1407(a)'s core considerations need to be flexible and must focus on the nature of the case being subject to transfer and the maturity of the proposed MDL location. And here, where the case *predates* all others, involves a unique and esoteric statute with a host of governmental interests, and has been investigated and litigated for over five years in its current venue, the inclusion of such a case into a closing MDL does not advance the mandates of Section 1407.

Indeed, the primary "overlap" between this case and the MDL is that the plaintiffs allege that ranitidine degrades and forms into NDMA. However, that issue is now fully litigated and *undisputed*. GSK's published root-cause analysis confirms that ranitidine degrades into NDMA, accelerated by heat and humidity—and in multiple depositions GSK has confirmed as much. FAC at ¶¶ 74–76. It is, after all, why the FDA pulled all ranitidine off the market and has not allowed it back. The questions that remain are, thus, specific to *this case*, i.e., whether NDMA contamination rendered claims paid for ranitidine false under various federal and state false claim acts and whether GSK's alleged fraud caused the submission of those false claims. These complex legal issues would be entirely novel to the MDL, which has almost exclusively focused on whether ranitidine causes cancer.

Critically, in bringing its false claim act claims, and contrary to GSK's assertions (Mot. at 14), Valisure *does not* have to prove that NDMA in ranitidine causes cancer, nor does Valisure intend to prove as much. Whether any person developed cancer as a result of taking ranitidine is irrelevant to Valisure's question: whether tax dollars spent on ranitidine were for false claims under various FCA statutes. Valisure alleges that because ranitidine degrades into NDMA, every dose of ranitidine is contaminated with NDMA, rendering the drug adulterated, misbranded,

11

worthless, and unfit for human consumption. FAC ¶ 4. Valisure's theory of "factual falsity" alleges that each claim and/or payment for ranitidine was factually false because GSK's fraudulent conduct caused the United States to pay for ranitidine products that were not actually ranitidine, but rather, ranitidine with NDMA. *Id.* ¶ 312. This is why it states the following, in the introduction to the FAC:

> ***This case is not about whether the NDMA in ranitidine causes cancer.*** That issue is at the heart of personal injury lawsuits related to ranitidine causing individual consumer's cancer—an issue that has little to do with this lawsuit. This lawsuit is about GSK's fraud on the federal and state governments and the money spent on ranitidine products by governments because of that fraud. Whether ranitidine increases the risk of cancer in humans is immaterial to this lawsuit.

FAC at ¶ 14 (emphasis added). Thus, setting aside NDMA's carcinogenic effects, the issue here is that GSK sold a product that contained an undisclosed contaminant, so whether that contaminant harmed any ranitidine users by causing cancer is irrelevant. GSK's attempt to inject cancer-causation is inapt, like trying to fit a square FCA claim into a round cancer MDL. Given the uniqueness of the Valisure *qui tam*, especially in light of the maturity of the MDL and the focus of that case, transfer is not warranted. *See In re: Zicam Cold Remedy Mktg. & Sales Pracs. Litig.*, 655 F. Supp. 2d 1371, 1373 (J.P.M.L. 2009) ("*Hohman* does not include the issue of whether the three Zicam products involved in the other actions cause anosmia. With respect to *Hohman,* we are persuaded that any factual questions that the action may share with the other actions are insufficient to warrant transfer at the present time.").

Crucially, Valisure's claims raise unique legal issues never explored in the MDL. As GSK acknowledges, the MDL court ***has not*** addressed claims under the federal and state FCA statutes. Mot. at 14. Given that the MDL is in its twilight, it should not take on the task of adjudicating a large, novel action like Valisure's that presents esoteric legal theories—theories and issues that have no applicability to any other case within the MDL. *See In re: Gaiam*, 672 F.

12

Supp. 2d at 1375 ("Incorporating two actions only peripherally related to the claims in MDL No. 1967 at this stage would not serve the purposes of Section 1407."); *In re Air Crash Disaster Near Silver Plume, Colo., on Oct. 2, 1970*, 368 F. Supp. 810, 811 (J.P.M.L. 1973) ("Plaintiffs' theory of liability in this action is based upon an alleged breach of warranty, whereas plaintiffs in the actions in Kansas allege liability based upon the certification and operation of the aircraft. Thus, the Oklahoma action raises only limited questions of fact common to the Kansas litigation."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 227 F. Supp. 2d 1389 (J.P.M.L. 2002) (even though "there may well be some factual overlap" between cases, "it appears that the conduct purporting to form the basis for legal liability in the eleven New York actions is largely distinct from the operative conduct at issue in [the] MDL").

GSK argues, nonetheless, that the Panel should transfer Valisure's case into the MDL because the Panel has transferred *qui tam* actions before. Mot. at 13. In doing so, it relies heavily on *In re Plavix Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 923 F. Supp. 2d 1376 (J.P.M.L. 2013). But *Plavix* is clearly distinguishable. There, the defendants moved for centralization of various actions pending in different jurisdictions, including a *qui tam* case, at the original formation of the MDL, when the *qui tam* case was central to the overall litigation. *In re Plavix*, 923 F. Supp. 2d at 1377. Indeed, Judge Wolfson of the District of New Jersey, who the Panel decided to designate as the eventual transferee court, had been "overseeing the Plavix cases . . . for several years" prior to formation of the MDL. *Id.* at 1379–80. Unlike *Plavix*, here, the Zantac litigation and subsequent MDL has existed for almost five years. *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1370 (J.P.M.L 2020) (ordering creation of the Zantac MDL on February 6, 2020, following the first lawsuits being filed in September 2019). And, as explained above, the Zantac MDL is effectively finished—with Judge Rosenberg proceeding to remand or dismiss personal injury cases that get drawn into the proceeding. This

qui tam case emerges not at the outset of the MDL, like in Plavix, but at its twilight, leaving the only "remaining" issues unique to the *qui tam* case.

To be clear, there are circumstances when inclusion of a *qui tam* case into an MDL make sense and promotes the purpose of Section 1407 transfer, overriding any drawbacks that inure from forced coordination. *Plavix* was one such example. This, however, is not that case.

## II. Transfer of this False Claims Act Case, Which Has Been Investigated and Pending in the Eastern District of Pennsylvania for Almost Five Years, Would Not Promote Efficiency or Justice

The mere "existence of common questions of fact" among actions is not sufficient to support transfer. *In re G.D. Searle & Co. "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. 1343, 1345 (J.P.M.L. 1980). Indeed, "transfer ... is not mandated [even] by a finding that common questions of fact permeate the actions." *In re Multidistrict Civil Antitrust Litig. Involving Photocopy Paper*, 305 F. Supp. 60, 61 (J.P.M.L. 1969). GSK must also demonstrate that transfer will further the convenience of the parties and witnesses and will promote the just, efficient conduct of all related actions. *See, e.g., id.*; 28 U.S.C. § 1407(a). GSK cannot meet this burden.

### A. Transfer Will Not Further Convenience of the Parties and Witnesses

Although GSK, in bringing a motion to transfer, clearly prefers to be in the Southern District of Florida in front of Judge Rosenberg, Valisure and witnesses would be greatly inconvenienced if transfer were ordered. Valisure first filed its *qui tam* action in the Eastern District of Pennsylvania five years ago in 2019. The case has remained in the Eastern District of Pennsylvania since then, being investigated and prosecuted by the Assistant United States Attorneys' ("AUSA") office in Philadelphia. The case only came out from under seal in March of this year. Critically, given the unique nature of false claim act litigation, the Department of Justice maintains a keen interest—indeed, a statutory obligation—in overseeing the progress of

14

the case. The local Philadelphia AUSA office has been doing just that since 2019.

Notwithstanding the AUSA's filing of a Notice of Election to Decline Intervention, the prospect of formal governmental intervention in the *qui tam*—which can happen at any time—weighs strongly against transfer. As the case goes forward, the United States retains the option to intervene; attend hearing and interpose statements of interest (especially in a case, like this, which raises novel FCA issues that have never been decided by a court); and even dismissing the case should the United States believe it can (there are statutory limitations). Transferring this Philadelphia-centered litigation to Palm Beach, Florida would plainly inconvenience the government's Philadelphia-based counsel.

The same is true for Valisure—it is a resident of Connecticut and would be greatly inconvenienced if required to litigate in Florida. Valisure chose to bring its lawsuit in Pennsylvania—the jurisdiction where all GSK's fraudulent conduct occurred—so transfer will deprive it of its choice of forum. Indeed, as Valisure and the United States will not waive *Lexicon*, when this case proceeds to trial, it will have to be transferred back to Philadelphia anyways.

Transfer will also deprive Valisure of its choice of counsel. If transferred, the *qui tam* would be subject to the supervision of the MDL's lead counsel and Valisure will be stuck with strategic decisions it never agreed to.[2]

Moreover, GSK will not be inconvenienced by proceeding in Philadelphia. Indeed, the

---

[2] This factor is not immaterial. Lead counsel in the MDL lost nearly every substantive legal fight, including *Daubert* on general causation, leading to the near complete dismissal of all claims in the MDL. Valisure's counsel, R. Brent Wisner and Jennifer Moore, have spearheaded the litigation in California and Delaware state court—outside of the MDL—where they have made vastly different strategic decisions, with different experts, leading to opposite rulings by state court judges. Indeed, many of the MDL's adverse rulings specifically hinge on the decisions and concessions made by the Plaintiffs' leadership in the MDL—decisions Valisure might be forced to live with, despite not agreeing with them. *See, e.g.*, *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2023 WL 4765409, at *6 (S.D. Fla. July 26, 2023) (noting Plaintiffs' counsel failure to articulate specific adulteration theory as dispositive of the court's ruling).

15

law firm representing GSK, Dechert LLP, and the attorneys specifically litigating this case, are headquartered in Philadelphia and New York. GSK's lead in-house counsel is based out of GSK's Philadelphia offices—which, until recently, was GSK's primary headquarters in the United States. Thus, transfer will surely inconvenience Valisure and the government, but proceeding in the Eastern District of Pennsylvania, near GSK's corporate offices and its counsel's headquarters, remains especially convenient for GSK.

### B. Transfer Would Not Promote Efficiency

Efficiency is a hallmark of Section 1407. Where transfer would serve to disrupt the progress made in an action or delay the termination of an action, consolidation is inappropriate. *In re Chiropractic Antitrust Litigation*, 483 F. Supp. 811, 813 (1980); *see also In re Qwest Communicational Int'l, Inc., Sec. and "ERISA" Litig.*, 395 F. Supp. 2d 1360, 1361 (J.P.M.L. 2005) (denying motion to transfer where "centralization would not necessarily … further the just and efficient conduct" of the litigation given the advanced stage of proceedings and the limited number of districts involved); *In re Ecuadorian Oil Concession Litig.*, 487 F. Supp. 1364 (J.P.M.L. 1980) (denying motion to transfer where centralization "could delay the termination of [one] action without producing any overriding benefits").

In its motion, GSK expresses efficiency concerns regarding "duplicative discovery." Mot. at 4. Whether there are suitable alternatives for avoiding duplicative discovery is something the Panel should consider. *See, e.g., In re MQVP Inc. Trademark Litig.,* 517 F. Supp. 2d 1365, 1366 (J.P.M.L. 2007); *In re Georgeson Shareholders Communs., Inc.,* 277 F. Supp. 2d 1372, 1373 (J.P.M.L. 2003); *In re G.D. Searle,* 483 F. Supp. at 1345; *In re 21st Century Productions, Inc. 'Thrilsphere 11 Contract Litig.,* 448 F. Supp. 271, 273 (J.P.M.L. 1978); *In re Fotomat Franchisee Litig.,* 394 F. Supp. 798, 799 (J.P.M.L. 1975). Alternatives include making available to the parties discovery previously completed in the transferee MDL or urging

coordination among courts to promote efficiency in the absence of a formal transfer. *See, e.g., In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Littg.,* 469 F. Supp. 2d 1348, 1350 (J.P.M.L. 2006); *In re Chiropractic Antitrust Litig.,* 483 F. Supp. 811, 813–814 (J.P.M.L. 1980); *In re Air Crash Disaster Near Upperville, VA on December I, 1974,* 430 F. Supp. 1295, 1297 n.2 (J.P.M.L. 1977) ("Of course, the judge to whom each of these actions is assigned can take appropriate steps to ensure that all the heretofore completed discovery in the transferee district is made available to all parties.").

Application of these principles to this case strongly counsels against transfer. Valisure "should be able to avail" itself of "the discovery already obtained in the MDL," even "absent transfer, many benefits of the MDL are available to expedite resolution" of this action. *In re: Checking Acct. Overdraft Litig.*, 818 F. Supp. 2d at 1374. Indeed, undersigned Counsel, representing Valisure, already has all the discovery from the MDL and every other state court proceeding. Such discovery would be duplicated only if GSK refuses to allow its use in this case. Any additional discovery would be *new* and specific to the unique claims in this case and would not be relevant to any other case pending in the MDL (which are all dismissed anyways). The Eastern District of Pennsylvania is well-equipped to handle such new discovery and arguably, better suited than the MDL, because it has presided over the case for five years. Efficiency would simply not be enhanced by transfer. If anything, it might be hindered by the invariable complications of trying to conduct case-specific discovery related to the United States and other state governments in a sprawling, almost wrapped-up MDL, with numerous protocols and procedures (from protective orders, ESI protocols, privilege orders, and deposition protocols) in place that simply do not make sense in this unique case.

### C. Transfer Would Not Promote Justice

Much of GSK's motion centers on the fact that Valisure "is already well known to the

17

MDL Court." Mot. at 2. But, as explained below, the MDL court's familiarity with Valisure—which has always been as a third-party—strongly militates *against* transfer.

The MDL Court has repeatedly disparaged Valisure, a third party, non-claimant in the MDL. In Judge Rosenberg's 300-plus-page *Daubert* order, Judge Rosenberg singled out Valisure in her introductory paragraphs as the "best starting point" for "the facts underlying this MDL[.]" *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1092 (S.D. Fla. 2022). She then went out of her way to attack Valisure's testing methodology, *id.*, even though Valisure is neither a party nor an expert in the MDL litigation. She further insinuated Valisure was in cahoots with plaintiffs' lawyers, *id.* at 1093, notwithstanding Valisure's track record of working with both the government and with pharmaceutical companies. She also claimed that the FDA found that Valisure's laboratory equipment lacked "validity" and that its method was unreliable—a finding reached even though the plaintiffs did not rely on Valisure data and Valisure was not present to defend their work. *Id.* at 1093 ("[T]he methods used by the Plaintiffs' chemist were unreliable and resembled (in many respects) the testing conducted by Valisure."). In other words, Judge Rosenberg made a decision about Valisure on issues directly relevant to this case, publicly announced it, and did so without ever hearing directly from Valisure on those issues. Judge Rosenberg's on-the-record statements raise significant concerns about apparent impartiality. *See United States v. Tucker*, 78 F.3d 1313, 1324 (8th Cir. 1996) ("It is the appearance of bias or partiality that matters here, not actual bias.").

Obviously, Judge Rosenberg did not know that Valisure might, one day, be a party before her, as this case was under seal when she rendered her *Daubert* order. But now, the specific adverse findings of fact she has made about Valisure, whether indicative of actual bias or not, undermine the appearance of impartiality that is central to the integrity of our judiciary. *See* 28 U.S.C. § 455(b)(1), (noting that federal courts should consider disqualification when impartiality

18

"might reasonably be questioned" and where the court has "personal knowledge of disputed evidentiary facts concerning the proceeding[.]"). Put simply, litigants should not have to litigate their case before a court that has publicly criticized them before they ever appeared before it. Thus, in the interest of justice and judicial integrity, the court should keep the *qui tam* in the Eastern District of Pennsylvania, where there is no concern about the appearance of impartiality.

### D. There is No Risk of Inconsistent Rulings

GSK also argues that transfer to the MDL is "important to eliminate the possibility of inconsistent rulings on *Daubert* motions and other pretrial matters." Mot. at 17 (internal quotations omitted). As explained above, GSK's concern is misplaced; Valisure, in its *qui tam* case, does not need to prove that Zantac causes cancer. Plaintiffs do not anticipate presenting any of the general causation experts retained by the Plaintiffs in the MDL. So, there is no risk of inconsistent *Daubert* rulings. And, on the legal issues, the MDL has not issued any orders that address the FCA issues present here. The legal issues at the heart of the matter are entirely novel to this case and have no application to the other cases in the MDL. Hence, there is no tangible risk of inconsistent rulings.

### CONCLUSION

For the foregoing reasons, GSK's motion to transfer Valisure's *qui tam* action to the Zantac MDL should be denied.

Dated: July 22, 2024                    **WISNER BAUM, LLP**

*/s/ R. Brent Wisner*
R. Brent Wisner, Esq.
CA Bar # 276023
rbwisner@wisnerbaum.com
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233

*Attorney for Relator and Plaintiffs*